**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | Case No. 07 C 1926 |
| KMART CORPORATION, *et al.*, | Honorable John F. Grady |
| Debtors. | |
| ——————————————— | |
| PHILIP MORRIS CAPITAL CORPORATION and HNB INVESTMENT CORP., | Appeal and Cross-Appeal from the United States Bankruptcy Court for the Northern District of Illinois, Hon. Susan Pierson Sonderby, Case No. 02 B 02474 (jointly administered) |
| Appellants/Cross-Appellees, | |
| v. | |
| KMART CORPORATION, et al., | |
| Appellees/Cross-Appellants. | **ORAL ARGUMENT REQUESTED** |

**BRIEF OF APPELLANTS
PHILIP MORRIS CAPITAL CORPORATION AND HNB INVESTMENT CORP.**

Thomas J. Magill
Leonard S. Shifflett
Christopher Combest
QUARLES & BRADY LLP
500 West Madison Street, Suite 3700
Chicago IL 60661-2589
Phone: (312) 715-5000
Facsimile: (312) 715-5155

*Attorneys for Appellants
Philip Morris Capital Corporation
and HNB Investment Corp.*

Dated: May 14, 2007

# TABLE OF CONTENTS

Page

I.      STATEMENT OF THE CASE...................................................................... 1

II.     BASIS OF APPELLATE JURISDICTION ................................................. 1

III.    STATEMENT OF ISSUES PRESENTED....................................................... 2

IV.     REQUEST FOR ORAL ARGUMENT UNDER FED. R. BANKR. P. 8012 .................. 2

V.      STATEMENT OF FACTS ............................................................................. 3

        A.      The Structured Finance Transaction and PMCC's Expected Return.................... 3

        B.      Events Leading to PMCC's Claims against Kmart................................ 4

        C.      The Role of the Tax Indemnification Agreement. ................................. 5

        D.      The Mahoney Damages Model Details PMCC's Unanticipated Tax
                Obligation. ...................................................................................... 6

        E.      Kmart's Response – Isaac Sperka Claims that Three Offsets Should
                Apply............................................................................................... 7

        F.      Only "Net Tax Benefits" Justify an Offset, Yet This SFT Was Structured
                to be Net Cash Flow Positive in Its Out Years. ..................................... 8

        G.      The Bankruptcy Court Lumped the Sperka Credits into the Single
                Category of "Tax Savings" in Order to Allow Them. ............................. 9

        H.      This Appeal Challenges the Bankruptcy Court's Lumping Approach, and
                Consequent Allowance of Each of the Three Sperka Offsets.................... 10

VI.     ARGUMENT .................................................................................................. 10

        A.      Standard of Review................................................................................... 10

        B.      The Bankruptcy Court Interpreted the Tax Indemnification Agreement So
                As to Defeat the Economics of the Transaction Which Were Plain from
                the Four Corners of the Agreement. ......................................................... 11

                (1)     The Controlling Contract Language ........................................... 12

                (2)     The Controlling Liquidated Damages Formula ........................... 15

                (3)     The Bankruptcy Court Erroneously Treated the Three Kmart
                        Claims as Calling for Only a Single Determination ..................... 17

                (4)     The Court's Wholesale Reliance Upon the UAL Decision to the
                        Exclusion of the Language of the Contract at Issue and the
                        Economics of the SFT Was Its Fatal Mistake............................ 18

                (5)     This SFT was so Structured that the Future Net After-Tax Cash
                        Flows Made it "Free Cash" Positive Throughout its Term........... 19

                (6)     Kmart's Claimed Offset Regarding Future Tax Duties Must Fail........... 23

## TABLE OF CONTENTS
### (continued)

Page

C.   The Application of a Credit Regarding Prior Accrued Interest Expense Violated Both the Parties' Tax Indemnification Agreement and Controlling Federal Tax Law................................................................................ 23

D.   The Granting of Whole Dollar Credit Upon the Unamortized Transaction Expenses Was Error............................................................................................ 28

E.   The Bankruptcy Court Erred in Granting Kmart's Asserted Credits Solely on the Testimony of Kmart's Expert Which Consisted Only of Ultimate Conclusions Unsupported by any Demonstrated Analysis, Methodology or Calculations......................................................................................................... 30

VII.   CONCLUSION............................................................................................................. 32

Appendix

Item 1 –  Schematic Representation of the Structured Finance Transaction
Item 2 –  Appellants'  Trial Exhibit 137 (Item 130 of Appellants' Designation of Record on Appeal)

Page

# TABLE OF AUTHORITIES

**Federal Cases**

*Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union*, 958 F.2d 1429 (7th Cir. 1992) ...................................................10,

*Golant v. Care Comm, Inc.*, 216 B.R. 248 (N.D. Ill. 1997) ...............................................10

*Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418 (7th Cir. 1990) ...............................30

*Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298 (N.D. Ill.1997) ...........................10

*Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir. 1989) .....................................................................................................................................30

*Mungo v. Taylor*, 355 F.3d 969 (7th Cir. 2004) ................................................................10

*In re UAL Corp.*, 346 B.R. 783 (Bankr. N.D. Ill. 2006) ...............................................17, 18

*U.S. v. Lighthall*, 389 F.3d 791 (8th Cir. 2004) ................................................................11

*Commissioner v. Tufts*, 461 U.S. 300 S. Ct. 1826, 75 L. Ed. 2d (1983) ...........................24

*Helvering v. Hammel*, 311 U.S. 504, 512, 61 S. Ct. 368, 85 L. Ed. 303 (1941) ...............24

*Chilingirian v. Commissioner*, 918 F.2d 1251 (6th Cir. 1990) .........................................24

*Allan v. Commissioner*, 856 F2d 1169 (8th Cir. 1988) .....................................................24

*Holtz v. J.J.B. Hilliard W. L. Lyons, Inc.* 185 F.3d 732 (7th Cir. 1999) ...........................29

**State Cases**

*BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (N.Y. 1999) .............................................11

*Papa Gino's of America, Inc., v. Plaza at Latham Assoc.*, 524 N.Y.S.2d 536 (N.Y. App. Div. 1988) ..................................................................................................11

*Boyle v. Petrie Stores Corp.*, 518 N.Y.S.2d 854 (N.Y. Sup. Ct. 1985) .............................12

# TABLE OF CONTENTS
(continued)

Page

**Federal Statutes and Regulations**

11 U.S.C. §§101, *et seq*...................................................................................................

11 U.S.C. §365(a) ...........................................................................................................

28 U.S.C. §157.................................................................................................................

28 U.S.C. §158, 158(a) ....................................................................................................

11 U.S.C. §365.................................................................................................................

28 U.S.C. §1334...............................................................................................................

I.R.C. §163.......................................................................................................................

I.R.C. §1001 ....................................................................................................................

Treasury Reg. 1.1001-2(a)...............................................................................................

**Federal Rules**

Fed. R. Bankr. P. 8002......................................................................................................

Fed. R. Bankr. P. 8012......................................................................................................

Local Rule of Procedure 40.3.1(a) ...................................................................................

## I.  STATEMENT OF THE CASE

Appellants, Philip Morris Capital Corporation and HNB Investment Corp. (collectively, "PMCC")[1] filed claims in the Kmart bankruptcy proceedings to recover certain liquidated damages arising by virtue of a premature termination of the parties' structured finance transaction.  Within that transaction, Kmart agreed to indemnify PMCC against its losses if the transaction terminated earlier than agreed.

The matter was tried before U.S. Bankruptcy Judge Susan P. Sonderby over six trial dates between November, 2005 and February, 2006.  On February 14, 2007, Judge Sonderby issued an opinion that granted PMCC's claims in part and denied them in part.  PMCC appeals only the portion of that opinion addressing PMCC's damages under the parties' Tax Indemnification Agreement,[2] and specifically the bankruptcy court's interpretation of that Agreement to include what the bankruptcy court labeled as "Tax Savings" in the calculation of PMCC's damages.  PMCC maintains that their inclusion defeats a key economic benefit for PMCC that is unambiguously part of the parties' contract.

## II.  BASIS OF APPELLATE JURISDICTION

The United States Bankruptcy Court for the Northern District of Illinois exercised jurisdiction to enter the orders appealed from under 28 U.S.C. §§157 and 1334 and Local Rule 40.3.1(a) of this Court.  Those orders are final for purposes of 28 U.S.C. §158.  On February 26, 2007, pursuant to Fed. R. Bankr. P. 8002, PMCC timely filed a notice of appeal.  This Court, therefore, has jurisdiction of the captioned appeal under 28 U.S.C. §158(a)(1).

---

[1] The Appellants are affiliate entities, with HNB being a wholly-owned subsidiary of PMCC.  Their interests in this matter are in all respects the same.

[2] In fact, two Tax Indemnification Agreements are at issue, one between Kmart and Philip Morris Capital Corporation and other between Kmart and HNB Investment Corp.  As the Bankruptcy Court below recognized, the two Agreements are identical in all relevant respects and thus are referred to in this Brief, as they were by the Bankruptcy Court, in the singular.  They are record items 2 and 3 submitted by PMCC and shall be cited to collectively herein as "TIA".

### III.   STATEMENT OF ISSUES PRESENTED

As part of their structured finance transaction, Kmart and PMCC signed a Tax Indemnification Agreement by which Kmart agreed to indemnify PMCC should PMCC lose any of the income tax benefits it was scheduled to receive over the course of the transaction. Both Kmart and PMCC have conceded that this Agreement is unambiguous, and the bankruptcy court has held that the liquidated damages provision in the Agreement is enforceable. The bankruptcy court also accepted PMCC's calculation that its tax liability from the early termination of the transaction was $21 million. The issues presented are:

1.     Does the plain language of the Tax Indemnification Agreement allow the bankruptcy court to deduct $16.7 million from the $21 million liquidated damages amount for perceived "tax savings," when doing so disregarded the additional cash flows that PMCC was to receive, and now will not receive, over the future life of the transaction?

2.     Even if the language of the Agreement permitted such deductions while disregarding future cash to PMCC – and it did not – were the deductions themselves properly calculated?  Specifically:

(a)     Should interest expense deductions that PMCC properly took before the indemnity was triggered be deducted from the damages?

(b)     Should the full amount of unamortized transaction expenses reduce the liquidated damages sum when the deeds-in-lieu of foreclosure Kmart's default served only to accelerate the timing of their deduction, but did not otherwise affect their ultimate deductibility?

3.     Did the bankruptcy court err by crediting the testimony of Kmart's expert witness who calculated the offsets where such testimony lacked any demonstrated analysis or methodology?

### IV.   REQUEST FOR ORAL ARGUMENT UNDER FED. R. BANKR. P. 8012

While district courts have discretion to proceed otherwise, as a general rule, oral argument should be granted in bankruptcy appeals.  *See* Fed. R. Bankr. P. 8012.  Although the basic issue in this appeal is a matter of contract interpretation, the appeal focuses on industry-specific language that is driven by the technicalities of tax law and the needs of a particular area

of commercial finance.  PMCC therefore believes that oral argument will be of assistance to the Court in this appeal.

## V.     STATEMENT OF FACTS

### A.     The Structured Finance Transaction and PMCC's Expected Return.

PMCC's claims arose from a complex form of structured finance transaction sometimes referred to as a leveraged lease.[3]  In its most general terms, such a transaction involves a series of agreements among various parties through which one party finances property by engaging in a sale/leaseback of that property with an investor which can use the tax benefits associated with that property.  Here, Kmart sold sixteen of its retail properties to a series of "Owner Trusts", receiving back $170 million.  Kmart then entered into lease agreements with each of the sixteen Owner Trusts so that it could continue to operate those retail outlets.  (PMCC R.151, Findings of Fact and Conclusions of Law (hereinafter cited as "Findings/Conclusions") at 2-4.)

PMCC, as the "Owner Participant", contributed approximately $22 million of the purchase consideration as its equity contribution, with the balance coming in the form of a public bond offering for which Bank of New York ("BONY") served as the indenture trustee.  (*Id*. at 3.) That bond offering was secured by mortgages against the sixteen properties plus assignments of the sixteen store leases, but was otherwise non-recourse. (*Id*. at 3, 5.)  A schematic depiction of the parties' structured finance transaction (hereinafter, the "Structured Finance Transaction" or "SFT") is attached at Appendix, Item 1.

Critical to the SFT was the fact that the Owner Trusts would be treated as "pass-through" entities for income tax purposes, so that PMCC could utilize the tax benefits that Kmart could not otherwise use—primarily, tax deductions for periodic depreciation on the properties and

---

[3] For convenience, references to the record items submitted by PMCC shall be in the form "PMCC R. _____", with the blank representing a given item number from PMCC's designation of items to be included in the record on appeal.

interest on the bond indenture obligations. (*Id*. at 4-5.) At the same time, PMCC was also required to report the full amount of the rental payments realized from Kmart as taxable income. (*Id*.) Another key element of the SFT was that it be so structured as to ensure that the portion of periodic rent flowing to PMCC – the so-called "free cash" payments – would be sufficient to fund its tax obligations across the full term of the SFT. (PMCC R. 139, Tr. 11/8/05 at 122:12-18; PMCC R. 143, Tr. 12/1/05 at 70:33 to 76:35.) As will be seen, those free cash payments were a critical part of the benefits for which PMCC bargained.

**B.** **Events Leading to PMCC's Claims against Kmart.**

The Structured Finance Transaction closed on May 4, 1995. On January 22, 2002, Kmart and numerous affiliates filed their voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq*. Those filings constituted an event of default under the Bond Indentures, causing all principal and interest obligations to accelerate and become immediately payable. (Findings/Conclusions at 9.) Consequently, BONY, as Indenture Trustee, acted to seize all rents due under the Kmart leases; notices of foreclosure were further posted against certain of the properties. (*Id*.)

Within the bankruptcy proceedings, Kmart ultimately elected to assume its leases upon six of the subject properties, rejecting the remaining ten leases. (*Id*. at 9-10; s*ee* 11 U.S.C. §365(a).) Between May, 2003, and March, 2004, deeds-in-lieu of foreclosure were exchanged between the Owner Trusts and BONY in satisfaction of the underlying non-recourse mortgage debt against those ten properties. (*Id*.)

As the bankruptcy court recognized, the deeds-in-lieu caused PMCC to incur an "Income Inclusion" for income tax purposes, in the form of the realization of debt forgiveness income. (Findings/Conclusions at 38.) Consequently, PMCC then became liable for the income taxes accruing on that income. (*Id*.) It is PMCC's realization of that tax duty which is at the heart of

this appeal. By the terms of the controlling Tax Assumptions, the parties never intended that PMCC should suffer that obligation. (*Id.*; *see also* TIA, Schedule B, Section (i).) As accepted by the bankruptcy court, and after application of the applicable "gross up", the total amount thereof was $21,080,373. (*Id.* at 19, 39-40.)

C.    **The Role of the Tax Indemnification Agreement.**

Features of the controlling tax law, including the ability to enjoy depreciation expense for tax purposes on an accelerated basis and the ability to deduct all bond interest expense even though the underlying indebtedness constituted non-recourse debt, are attractive aspects of a structured finance transaction for an owner participant such as PMCC. (Findings/Conclusions at 5; PMCC R. 139, Tr. 11/8/05 at 109:21-23, 112;4-13, 114:4-11.) Admittedly, in the later years (this SFT was set to end in the year 2020) the levels of available depreciation and interest expense are less, causing some to view a structured finance transaction as essentially generating only timing advantages for the owner participant, with a price then paid in the form of higher back-end income taxes. However, as testified to by Steven Seagriff, a PMCC Vice President and its Chief Compliance Officer, the present Structured Finance Transaction was so structured as to insure that the portion of periodic rental incomes flowing to PMCC (as "free cash") in the later years would be sufficient to fund the tax duties accruing in those out years, so that the present Structured Finance Transaction would be cash positive for PMCC even in that later phase. (PMCC R. 143, Tr. 12/01/05 at 70:33 to 76:35.)

As recognized by the bankruptcy court, central to PMCC's willingness to undertake the Structured Finance Transaction was its receipt of the above-identified tax benefits. (Findings/Conclusions at 4-5.) To protect itself in that regard, PMCC required that Kmart indemnify it against the risk that any of the given tax benefits might be lost. For that purpose, PMCC required that Kmart execute a certain Tax Indemnification Agreement. (*Id.* at 5, 7-8.)

- 5 -

At core, the Tax Indemnification Agreement provides that PMCC's suffering of a proscribed Income Inclusion (here, PMCC's realization of debt forgiveness income as a consequence of the deeds-in-lieu) triggers Kmart's duty to indemnify. (*Id.* at 38.) The formula for determining the amount of that indemnity is complex; under the controlling New York law, as the bankruptcy court held, it constitutes a formulaic liquidated damages approach to determining Kmart's indemnity obligation, which the court below enforced. (*Id.*)

### D. The Mahoney Damages Model Details PMCC's Unanticipated Tax Obligation.

As presented at trial by PMCC's in-house tax counsel, Richard W. Mahoney, the methodology or formula for the determination of PMCC's tax indemnification entitlement was as follows (PMCC R. 46, PMCC Trial Exhibit 46, Exhibit A):

| Store Location | Deed In Lieu Closing Date | A<br>Amount Realized | B<br>Adjusted Tax Basis | C<br>Taxable Gain | D<br>Federal and State Tax | E<br>Total Consequence Adjustment | F<br>Total Tax Indemnity Claim |
|---|---|---|---|---|---|---|---|
| Amsterdam, NY | 07/21/03 | $13,678,421 | $9,327,411 | $4,351,010 | $1,771,166 | $1,170,971 | $2,942,137 |
| Mission Viejo, CA | 05/09/03 | 12,884,423 | 9,023,724 | 3,860,699 | 1,573,081 | 1,040,011 | 2,613,092 |
| Fresno, CA | 05/09/03 | 16,509,222 | 11,467,238 | 5,041,984 | 2,054,407 | 1,358,230 | 3,412,637 |
| Highland, CA | 05/09/03 | 7,380,656 | 5,140,941 | 2,239,714 | 912,594 | 603,343 | 1,515,937 |
| Mankato, MN | 08/04/03 | 7,743,886 | 5,250,769 | 2,493,117 | 1,031,402 | 681,891 | 1,713,293 |
| Lafayette, GA | 07/16/03 | 5,274,097 | 3,538,651 | 1,735,446 | 675,089 | 446,322 | 1,121,411 |
| Hilliard, OH | 03/19/04 | 7,529,183 | 5,205,093 | 2,324,090 | 945,161 | 624,874 | 1,570,035 |
| San Antonio, TX | 10/22/03 | 11,464,915 | 8,550,322 | 2,914,593 | 1,105,359 | 730,786 | 1,836,145 |
| Waco, TX | 10/16/03 | 14,491,035 | 10,707,294 | 3,783,741 | 1,434,984 | 948,711 | 2,383,695 |
| Sherman, TX | 10/21/03 | 12,014,952 | 8,884,722 | 3,130,230 | 1,187,140 | 784,854 | 1,971,994 |
| | | $108,970,789 | $77,096,165 | $31,874,623 | $12,690,381 | $8,389,992 | $21,080,373 |

<u>Column A – Amount Realized</u>:  In each case, this is the amount of the then outstanding principal and accrued interest forgiven by virtue of the deeds-in-lieu.

<u>Column B – Adjusted Tax Basis</u>:  Here, PMCC's then remaining basis for each property is set forth so that the same may be deducted from the Amount Realized to arrive at PMCC's Taxable Gain resulting from the Income Inclusions.

<u>Column C – Taxable Gain</u>:  This is the amount of PMCC's taxable gain as a consequence of the proscribed Income Inclusions.

- 6 -

Column D – Federal and State Tax:  Utilizing the tax rates called for under the Tax Indemnification Agreement, the tax obligation upon the Taxable Gain is determined.

Column E – Total Consequence Adjustment:  The satisfaction of Kmart's tax indemnification obligation will itself give rise to taxable income in the full amount of that duty; consequently, the Tax Indemnification Agreement requires a "gross up" of Kmart's basic obligation in an amount sufficient to insulate PMCC from the adverse effect thereof.  Column E provides the requisite amount.

Column F – Total Tax Indemnity Claim:  Here, columns D and E are combined to arrive at the final amount of Kmart's tax indemnification obligation of $21,080,373.

(PMCC R. 140, Tr. 11/9/05 at 25:13 to 51:5.)

E.     **Kmart's Response – Isaac Sperka Claims that Three Offsets Should Apply.**

Neither the formula applied by Richard Mahoney nor the resulting total amount of indemnifiable damages of $21,080,373 was disputed by Kmart, and both were accepted by the bankruptcy court.  (Findings/Conclusions at 39.)  Thus, absent the establishment by Kmart of some basis under the parties' formulaic liquidated damages model to reduce that amount, PMCC's claim must stand at $21,080,373.  Through the testimony of its only witness, Isaac Sperka, Kmart advanced its claim to three separate offsets.  Specifically, through Sperka, Kmart claimed first that the controlling provision of the Tax Indemnification Agreement calls for a subtraction from the $21,080,373 figure for the present value of the "future taxes" that PMCC will no longer incur on the rents that Kmart will now never pay.  (*Id.*; PMCC R. 142, Tr. 11/30/05 at 106:5-8.)[4]

Second, in confusing testimony, Sperka asserted that PMCC's $21,080,373 claim must be further reduced to account for then accrued interest upon the principal indebtedness. (Findings/Conclusions at 40; PMCC 142, Tr. 11/30/05 at 106:15-22.)  Finally, Sperka pointed

---

[4] Some transcript pages bear two different page numbers; in those instances, PMCC will cite to the page number that is closer to the left margin on the transcript page.

out that, by virtue of the deeds-in-lieu, PMCC's then remaining, or "unamortized", transaction fees and related costs arising from the negotiation of the SFT would no longer be required by the controlling tax laws and the Tax Indemnification Agreement to be amortized in annual increments, but, rather, could all be expensed currently for tax purposes. (Findings/Conclusions at 39-40; PMCC R. 142, Tr. 11/30/05 at 106:9-14.) The full amount of the resulting current income tax deduction was then claimed by Sperka to be an offsetting benefit for PMCC, to be credited against its $21,080,373 tax liability. (*Id.*)

**F.      Only "Net Tax Benefits" Justify an Offset, Yet This SFT Was Structured to be Net Cash Flow Positive in Its Out Years.**

Of course, as a contract the Tax Indemnification Agreement could provide whatever terms the parties might elect. Indisputably, this Agreement could thus have been drafted to provide for the three Sperka offsets – however, as the bankruptcy court itself recognized, for that to be the case two things would need to be true: (i) the posited credits must be found to constitute "… net income tax benefits reasonably expected to be realized by [PMCC] by reason of …" the circumstances giving rise to its Loss; and (ii) the same must fit within the limits of the controlling formulaic liquidated damages provisions of the Tax Indemnification Agreement. (Findings/Conclusions at 38, 40.)

Thus, it would not be enough merely to conclude that the deeds-in-lieu effected an elimination of a future tax duty or otherwise altered an income tax feature of the controlling structure of the Transaction. By the very language to which the parties agreed for their damages calculation formula, only if the same further resulted in a "net income tax benefit" to PMCC would a credit be appropriate.

PMCC's unrebutted evidence established that PMCC so constructed the Structured Finance Transaction so that the component of Kmart's future rental payment obligations to be

received by PMCC as "after-tax cash flows", or "net free cash", would be sufficient to effectively cover, or satisfy, future income taxes anticipated to arise from rents scheduled to be paid subsequent to PMCC's loss of the ten properties and through the end point of the SFT in the year 2020. (PMCC R. 143, Tr. 12/1/05 at 70:33 to 76:35.) On these facts, it is difficult to see how the avoided future taxes could possibly be construed as a "net income tax benefit" for PMCC. Since a resource within the Structured Finance Transaction – the free cash from the Kmart rent – was priced into the Transaction to pay those taxes as they arose, the presence of that future tax obligation was never to be a net burden for PMCC; its elimination thus could never constitute a net benefit for PMCC.

Similarly, the Sperka offsets for accrued but unpaid interest and unamortized fees do not satisfy the terms of the required formulaic liquidated damages methodology adopted under the parties' Tax Indemnification Agreement, and should not have been allowed by the bankruptcy court.

**G.     The Bankruptcy Court Lumped the Sperka Credits into the Single Category of "Tax Savings" in Order to Allow Them.**

In considering PMCC's Tax Indemnification Agreement based claim, the bankruptcy court first accepted PMCC's calculation thereof at the full $21,080,373 amount. (Findings/Conclusions at 39.) However, and without any stated basis to explain its reasoning, the bankruptcy court then summarily determined to aggregate Sperka's three asserted credits as all constituting what the court labeled "Tax Savings". (*Id.* at 40.) As "Tax Savings", the bankruptcy court apparently saw the same as all constituting "net income tax benefits". Relying upon a decision rendered by U.S. Bankruptcy Judge Wedoff in the *UAL* bankruptcy, the court next rejected PMCC's argument regarding the joinder of future net free cash to future income

taxes. (*Id.* at 42-43.) Instead, the bankruptcy court applied what it had aggregated as the "Tax Savings", and limited PMCC's Tax Indemnification recovery to $4,308,626. (*Id.* at 44-45.)

**H.** **This Appeal Challenges the Bankruptcy Court's Lumping Approach, and Consequent Allowance of Each of the Three Sperka Offsets.**

It is to challenge the propriety of each of the three offsets or credits and imposed by the bankruptcy court that this appeal is being prosecuted.[5]

## VI. ARGUMENT

**A.** **Standard of Review.**

At trial, PMCC and Kmart each asserted that the TIAs and related documents are unambiguous, and the Bankruptcy Court accepted that characterization. Opinion at 42. The Bankruptcy Court therefore construed those unambiguous contracts as a matter of law, and that interpretation presents a question of law that this Court reviews *de novo. Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union*, 958 F.2d 1429, 1434 (7th Cir. 1992).

While the trial court's findings of fact are reviewed for clear error, any other conclusions of law are similarly reviewed *de novo*, as are mixed questions of law and fact. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004) (bankruptcy appeal); *Golant v. Care Comm, Inc.*, 216 B.R. 248, 252 (N.D. Ill. 1997) (same); *Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298, 301 (N.D. Ill. 1997) (same). PMCC argues on appeal not only that the Bankruptcy Court erred, as a matter of law, in finding that the liquidated damages formula of the TIAs allowed for reductions in PMCC's tax indemnification claim; PMCC also argues that the reductions, even if permissible,

---

[5] PMCC does not contest the outcomes below regarding PMCC's claims under the parties' Participation Agreement.

were miscalculated. This calculation issue is a mixed question of fact and law, reviewed *de novo*. *Id.*

Finally, in determining the amount of the reductions, the Bankruptcy Court credited testimony of Kmart's sole witness – its expert, Isaac Sperka – that contained little more than bottom-line figures, without explanation of how they were arrived at or why the method of reaching them was appropriate or correct. Under Seventh Circuit standards, the Bankruptcy Court should have ignored Sperka's testimony. PMCC's challenge on this matter is an issue reviewed for clear error. *See, e.g.*, *U.S. v. Lighthall*, 389 F.3d 791, 795 (8th Cir. 2004) (weight given to expert testimony reviewed for clear error).

**B.     The Bankruptcy Court Interpreted the Tax Indemnification Agreement So As to Defeat the Economics of the Transaction Which Were Plain from the Four Corners of the Agreement.**

In reaching its ultimate conclusions, the bankruptcy court below set down two foundations. First, the court held that the controlling Tax Indemnification Agreement was unambiguous and thus subject to being construed on its own terms. (Findings/Conclusions at 42.) Second, the court concluded that the Tax Indemnification Agreement adopted a formulaic liquidated damages approach to determining PMCC's entitlement. (*Id.* at 38.)

Both PMCC and Kmart acknowledged at trial that the Tax Indemnification Agreement is unambiguous. (*Id.* at 42; PMCC R. 139, Tr. 11/8/05 at 8:25 to 9:11.) Upon the proper application of the controlling New York authorities regarding the use of liquidated damages clauses, the subject contract fixes a formulaic liquidated damages methodology to determine PMCC's entitlements. *See, e.g., BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1227 (N.Y. 1999) (explaining that formulaic provisions for the calculation of damages "essentially represent a liquidated damages clause"); *Papa Gino's of America, Inc. v. Plaza at Latham Assoc.*, 524 N.Y.S.2d 536, 538 (N.Y. App. Div. 1988) (stating that formula for computing "percentage rent"

if defendant breached covenant of contract was a liquidated damages clause, and treating it as such); *Boyle v. Petrie Stores Corp.*, 518 N.Y.S.2d 854, 860 (N.Y. Sup. Ct. 1985) (treating formula for computing liquidated damages in the event of termination of employment as provision for damages). That New York's substantive law of contract damages controls is clear from the Tax Indemnification Agreement itself. (TIA, §11, at 15.) The court below was therefore also correct in adopting that methodology. (Findings/Conclusions at 37-38.)

### (1)    The Controlling Contract Language

While the court below made its determinations on the basis of the formula contained within the Tax Indemnification Agreement (thus incorporating the so-called "Tax Savings" as "… a component of the clause …"), the court gave little guidance as to the specific terms of that formula. (Findings/Conclusions at 40.) In any event, the proper interpretation of the Agreement is a question of law to be reviewed *de novo* by this Court. *Bennett*, 958 F.2d at 1434. PMCC accordingly submits that a detailed reexamination of the controlling contractual language is required.

Recall that it was the deeds-in-lieu from the Owner Trusts, as pass-through entities for income tax purposes,[6] which caused the PMCC to experience the unanticipated immediate realization of forgiveness of indebtedness income. (Findings/Conclusions at 38.) Under the terms of the parties' Tax Indemnification Agreement, no such taxable income and consequent income tax obligation were to be experienced. (*Id.*) Kmart's tax indemnification obligations as

---

[6]  As suggested previously, for tax purposes the Owner Trusts are functionally ignored; thus, notwithstanding the structure in law under which those Trusts are the owners of the subject properties and the lessors thereof to Kmart, for tax purposes the benefits of ownership reside in PMCC, as the Owner Participant. As such, the rental incomes are treated as having been received directly by PMCC, which must report the full amounts of those rents as income on its tax returns. Similarly, interest on the BONY mortgage debt is viewed as PMCC's expense and all depreciation deductions are to be entitled to be enjoyed by PMCC as reductions against its gross taxable income.

set forth at Section 3 of the Agreement accordingly applied to insulate PMCC from that adverse event. (*Id*. at 7-8.)

Section 3 provides in pertinent part as follows:

> (i) if as a result of: … (VII) any pursuit of remedies (whether by the Owner Participant or Indenture Trustee or otherwise) following an Event of Default … the Owner Participant … (B) shall be required to include in gross income for Federal, state or local income tax purposes any amount not described in any of clauses (i) through (iv) of paragraph (i) of Schedule B hereto (an "Income Inclusion"): (any of the foregoing events … being referred to hereinafter as a "Loss"), Kmart will pay to the Owner Participant an indemnity …

(TIA, §3(a)(i), at 3-4.) In short, when PMCC suffers an "Income Inclusion" which is outside the limits of Schedule B, then it will have suffered a "Loss" for which Kmart must pay an indemnity.

As confirmed by Mahoney in his trial testimony, Schedule B to the Tax Indemnification Agreement details the controlling "Tax Assumptions", or tax benefits, which the parties contractually agreed PMCC was to enjoy over the life of the Structured Finance Transaction (PMCC R. 140, Tr. 11/9/05 at 16:23 to 17:15.). At Section (i) of Schedule B, the parties agreed that PMCC would only experience certain specified items of "gross income" for tax purposes. (TIA, Schedule B, at B-2.) It was not disputed that the Income Inclusion resulting from the deeds-in-lieu was not one of those items. Thus, the deeds-in-lieu caused PMCC to experience an indemnifiable "Loss", and the bankruptcy court below so held. (Findings/Conclusions at 38.)

Section 3 provides that in the event a Loss has occurred, "Kmart will pay to the Owner Participant an indemnity, determined pursuant to either clause (y) or (z) below." (*Id.*, §3(a), at 4.) Both parties agreed, and the bankruptcy court accepted, that clause (y) is inapplicable here. (Findings/Conclusions at 7.) Clause (z) provides, in relevant part, that

> Kmart shall pay to the Owner Participant as an indemnity a lump-sum amount which, on an After-Tax Basis, shall be sufficient to

- 13 -

> preserve the Owner Participant's Economics as if such Loss had
> not occurred.

(TIA, §3(a), at 5.) Clause (z) thus requires the determination of that "lump-sum amount" which

is "sufficient to preserve the Owner Participant's Economics". *Id*. The definition of "Owner

Participant's Economics" is provided in the Participation Agreement[7] at Section 21(d):

> (d) "Owner Participant's Economics" shall mean Owner
> Participant's nominal after-tax yield, total after-tax cash flow and
> total [Financial Accounting Standards Board] after-tax lease
> income for the first five years utilizing the multiple investment
> sinking fund method of analysis computed on the basis of the
> same methodology and assumptions as were utilized in Owner
> Participant's original calculation of Basic Rent and Termination
> Value.

(Participation Agreement, §21(d), at 44.)

Thus, the term "Owner Participant's Economics" was intended to protect the three

expectations of the Owner Participant which Seagriff identified in his testimony as key to

PMCC's entry into the transaction:

> (1) nominal after-tax yield,
> (2) total after-tax cash flow, and
> (3) financial statement income.

By the very language of the parties' Agreement, the amount of the indemnity must be sufficient

to protect each of those three economics. Here, the controlling Owner Participant's Economics

at issue, and the basis of PMCC's entitlement, is the requirement that the lump sum amount be

sufficient to preserve PMCC's total after-tax cash flow. (PMCC R. 140, Tr. 11/9/05 at 18:19 to

20:21.)

Thus, the foundation requirement is that PMCC's damages award be in that amount

which protects its future anticipated after-tax cash flows. Any other result would violate the

---

[7] The Participation Agreement (PMCC R. 1, hereinafter cited as "Participation Agreement") is the overarching agreement among all parties, which served to control the Structured Finance Transaction.

requirement that the indemnity to be paid by Kmart "…be sufficient to preserve the Owner Participant's Economics as if such Loss had not occurred." (TIA, §3, at 5.) That root requirement from the parties' Agreement requires that any determination of its damages take into account the totality of anticipated future events in order to evaluate properly any proposed offsets for "…net income tax benefits reasonably expected to be realized by the Owner Participant by reason of the circumstances or adjustments giving rise to the Loss." (*Id*. at 6.) In this case, the "circumstances or adjustments giving rise to the Loss" also gave rise to the loss of the free cash flows that were factored into the Transaction to pay the future taxes. To nevertheless ignore the overarching requirement that the indemnity be sufficient to "preserve" PMCC's "total after-tax cash flows" would be to thus ignore a critical component of the Agreement now at issue.

Against the backdrop of that foundational requirement, the lump-sum amount necessary to preserve PMCC's total after-tax cash flow on an After-Tax Basis can be calculated. Continuing with Clause (z) of the Tax Indemnification Agreement:

> The computation of such lump-sum amount shall be made by the Owner Participant utilizing the methodology and assumptions, including the Tax Assumptions, utilized by the Owner Participant in determining Basic Rent and Termination Value, except as such assumptions shall be varied to take into account such Loss and any prior Loss.

(*Id*. at 5.) In other words, the actual "lump-sum amount" to be paid to PMCC as its indemnity is to be determined based on the original assumptions used in pricing the transaction, as varied because of the occurrence of the Loss.

### (2) The Controlling Liquidated Damages Formula

Under the instant Tax Indemnification Agreement, PMCC respectfully submits that the applicable liquidated damages formula is therefore as follows:

    a.    First, Section 3 of each Tax Indemnification Agreement directs that a determination be made of the amount required to be included in PMCC's gross

income for income tax purposes as a result of PMCC's realizing cancellation-of-indebtedness income (its "Income Inclusion") as a consequence of the deeds-in-lieu;

b.  Second, it must be determined that the given Income Inclusion resulting from the deeds-in-lieu was an event outside the limits of the "Tax Assumptions" set forth at Schedule B to the Tax Indemnification Agreement, and thus constituted a indemnifiable "Loss".

Assuming an "Income Inclusion" amount can be fixed which is outside the contemplation of the Schedule B Tax Assumptions, the "lump-sum amount" to be allowed to PMCC as its tax indemnification entitlement must be calculated. The actual calculation is as follows:

c.  Initially, Clause (z) of Section 3 fixes the fundamental requirement that the amount "…shall be sufficient to preserve the Owner Participant's Economics as if such Loss had not occurred";

d.  Given that Section 21(d) of the Participation Agreement provides three distinct Owner Participant's Economics [or "OPE's"] to be preserved, the applicable OPE must be identified;

e.  As against the base-line requirement that it is "sufficient to preserve" the applicable OPE "as if such Loss had not occurred", the amount of the actual Loss must be calculated;

f.  Clause (z) directs that the actual Loss calculation "…shall be made… utilizing the methodology and assumptions, including the Tax Assumptions …" otherwise applicable to the parties' Structured Finance Transaction;

g.  Finally, Clause z requires that the PMCC's calculation "…shall take into account …any Federal, state or local net income tax benefits reasonably expected to be realized by [PMCC] by reason of the circumstances or adjustments giving rise to such loss."

Here, the bankruptcy court concluded that (i) the tendering of the deeds-in-lieu to the Indenture Trustee caused PMCC to realize cancellation-of-indebtedness income under controlling federal and state tax law; (ii) the realization of that income constituted an "Income Inclusion", as defined by the Tax Indemnification Agreement, which created an unanticipated tax obligation on the part of PMCC, thus triggering (iii) Kmart's indemnification liability. (Findings/Conclusions at 38.) As to the actual Loss calculation, the bankruptcy court accepted

- 16 -

the methodology and result of Mahoney's Damages Model fixing that "lump-sum amount" at $21,080,373. (*Id*. at 38-39.)

**(3)     The Bankruptcy Court Erroneously Treated the Three Kmart
        Claims as Calling for Only a Single Determination**

Kmart defended against the $21,080,373 amount by advancing its three offsets, including: (i) a $9,076,559 offset for the present value of the future income taxes on the future rents which will now never be paid; (ii) $7,307,865 for the income tax deductions assertedly associated with the so-called accrued but unpaid interest; and (iii) $387,323 upon the accelerated deductibility of PMCC's transaction expenditures incurred in the initial development of the parties' Structured Finance Transaction. (*Id.* at 39-40.) The bankruptcy court sided with Kmart, and granted the three credits. (*Id.*)

Specifically, the court first determined to consider all three items of offset as parts of the same whole, which the court then labeled as the so-called "Tax Savings". (*Id.*) No justification was given to explain why the court considered the three alleged offsets to be conceptual equals; instead, the court simply adopted that position, then immediately proceeded to rule upon their deductibility in the aggregate.[8] (*Id.*) PMCC respectfully submits that the bankruptcy court's aggregation was a material misstep on that court's part which directly led to the erroneous outcome now challenged.

---

[8] The explanation may lie within the *UAL* decision discussed at page 18, *infra*. While not the case under the instant Tax Indemnification Agreements, "Tax Savings" is a defined term in the contracts at issue in *UAL*. *In re UAL Corp*., 346 B.R. 783, 787, n.3 (Bankr. N.D. Ill. 2006), *aff'd in part and rev'd in part*, No. 06 C 4243, 2007 WL 256323 (N.D. Ill. Jan. 22, 2007), *appeal docketed*, No. 07-1340 (7th Cir. Feb. 15, 2007).

**(4)  The Court's Wholesale Reliance Upon the *UAL* Decision to the Exclusion of the Language of the Contract at Issue and the Economics of the SFT Was Its Fatal Mistake**

The bankruptcy court's core determinations dictate that no credit can be granted unless it fits within the controlling formulaic liquidated damages model adopted within the Tax Indemnification Agreement. Thus, this is not a case of simple contract damages where, *e.g.*, concepts of mitigation could apply. Given the terms of the controlling formula, Kmart could only be entitled to a credit if the given item were determined to constitute a "net income tax benefit" to PMCC resulting from the "events or circumstances giving rise to the Loss." In making that determination, PMCC's critical Owner Participant's Economics must be protected.

At pages 40-43 of its Findings of Fact and Conclusions of Law, the bankruptcy court relied upon U.S. Bankruptcy Judge Wedoff's decision in the *UAL* bankruptcy to hold that the three offsets are properly deductible under Clause (z). In so doing, the bankruptcy court made no attempt to even determine that the specific contractual language addressed by Judge Wedoff mirrored the instant provision limiting any credit for Kmart to only those items shown by it to constitute offsetting "net income tax benefits". (*Id.*) Without such a determination, PMCC respectfully submits that Judge Wedoff's work in *UAL* is of no moment in this matter.

In wholesale reliance upon *UAL*, the court interpreted Clause (z) as requiring a deduction from the $21,080,373 unanticipated tax obligation for the discounted present value of future taxes that the unanticipated obligation served to eliminate. (*Id.* at 39-40.) To reach its conclusion, the court rejected PMCC's evidence of the anticipated net future cash flows to be received by PMCC from the parties' Structured Finance Transaction (*id.* at 42); eliminating both future taxes and the flows to pay those taxes would have yielded zero net income tax benefit.

In so doing, the bankruptcy court simply ignored the key requirement that the indemnity must serve to preserve PMCC's Owner Participant's Economics, and specifically its total after-tax cash flows. In the bankruptcy judge's view, future cash flows (*i.e.*, the free cash from Kmart's expected rent payments) were outside the liquidated damages formula contained within the parties' Tax Indemnification Agreement notwithstanding that Agreement's requirement that PMCC shall be entitled to an amount sufficient to preserve PMCC's Owner Participant's Economics, specifically including its "after tax cash flows". (*Id.* at 42-43.)

PMCC submits that this determination was the bankruptcy court's critical error. Because the proper interpretation of an unambiguous contract provision is a question of law, this court reviews the bankruptcy court's conclusion *de novo*. *Bennett,* 958 F.2d at 1434.

**(5)     This SFT was so Structured that the Future Net After-Tax
Cash Flows Made it "Free Cash" Positive Throughout its Term**

As suggested above and as recognized by the bankruptcy court in its Findings of Fact and Conclusions of Law, throughout the term of the SFT, a portion of the Kmart rental payments was intended to and did flow to PMCC. (*Id.* at 4; PMCC R. 139, Tr. 11/8/05 at 113:10-19, 115:14-25.) To demonstrate the impact of future net free cash payments upon the anticipated future tax obligations, and thus to give proper context for the court in its determination of the operation of the applicable liquidated damages clause, PMCC provided the testimony of its Director of Pricing, Kenneth Nekola.

As explained by Nekola and confirmed in the bankruptcy court's decision, the analysis of a structured finance transaction throughout its development and final negotiation is undertaken utilizing so-called ABC Pricing Files, which Files, or pricing runs, are a series of reports generated from a complex computer program designed to identify expected returns and related

financial information. (Findings/Conclusions at 3, PMCC R. 139, Tr. 11/8/05 at 128:3-13 (testimony of K. Nekola); *see also id*. at 97:20 to 99:25 (testimony of S. Seagriff).)

A central feature of Nekola's testimony both on direct and in rebuttal was his discussion of the role net free cash was to play in the present SFT. Net free cash is that portion of the rental payments received by the Owner Trusts above amounts required to satisfy the BONY debt service obligation and other trust expenses. (PMCC R. 139, Tr. 11/8/05 at 113:11-19.) Such excesses were to be distributed to PMCC, as the Owner Participant. (*Id*.) As explained by Nekola, one function of the ABC Pricing Files is to predict and then track cash flows over the life of the SFT. (*Id*. at 131:14 to 135:23.)

The critical evidence then came in Nekola's rebuttal testimony. Utilizing PMCC's admitted Trial Exhibit 137 (PMCC R. 130, hereinafter cited to as "Exhibit 137"), that witness explained that he caused a special ABC Pricing File analysis to be generated that isolated the ten properties. (PMCC R. 143, Tr. 12/1/05 at 70:25 to 72:5.) For the Court's convenience, a copy of Exhibit 137 is attached hereto as Appendix, Item 2. As explained by Nekola, Exhibit 137 sets forth cash flows for the ten stores across the twenty-five year term of this Structured Finance Transaction. (*Id.* at 70:25 to 71:15.)

As such, Exhibit 137 reflects the booking of the original loan proceeds at the top of the column entitled "Purchase, Loan Draw & Residual"; the next two columns then identify the "Fees and Other Revenue & Expense" amounts incurred by PMCC at the deal's inception. The next four columns set forth the anticipated "Rent" to be paid by Kmart and the portion thereof to be utilized to make the BONY "Debt Service" payments (with each of "Interest on Loan" and Principal Repayment" first displayed separately). (*Id.* at 72:25 to 73:13.) The column "Pre-Tax Cash Flow" provides the balance of each Rent payment remaining after the satisfaction of the

then current Debt Service obligation. (*Id*. at 73:7-27.) Essentially, this is thus the "net free cash" in the Transaction for PMCC. (*Id*. at 72:2 to 73:17.)

The column "Cash Taxes" provides the value of tax deductions realized from the SFT in dollar equivalent terms; in the words of Nekola: "That shows the taxes that are either credited or paid by [PMCC] over the life of the deal." (*Id*. at 75:19-27.). The "After-Tax Cash Flow" figures derive from the deduction of Cash Taxes amounts from their Pre-Tax Cash Flow counterparts. (*Id*. at 73:19-23.) The final column, "Cumulative After-Tax Cash Balance", then provides the running tally of the After-Tax Cash Flow figures over the twenty-five year term. (*Id*. at 73:29-37.)

Ultimately, Exhibit 137 bears out Seagriff's testimony that the instant Structured Finance Transaction was so structured as to insure that it would be cash flow positive for PMCC across its life, ultimately by some $17,747,691. (*Id*. at 76:21-35.) However, since the deeds-in-lieu did not occur until 2003[9], the analysis must include an examination of the Transaction from that point through the intended maturity in 2020. Nekola explained that his hand-written notations on the face of Exhibit 137 provide those amounts. (*Id*. at 76:37 to 77:51.) Specifically, during that period total Pre-Tax Cash Flows were expected to be $30,929,350 while Cash Taxes were projected at $19,645,254, leaving positive After Tax Cash Flows of $11,284,096. (*Id*.) Thus, as Seagriff claimed, this Transaction was so structured as to be net cash flow positive even in its out years.

True, Nekola's calculations include the Residual Value expected to be realized from the properties at the scheduled termination date in 2020, and, as Kmart stressed in its trial presentation, the Residual Value (essentially, projected market value) at that point is not

---

[9] More precisely, nine of the ten properties were transferred in calendar 2003, with the Hilliard, Ohio premises then deeded out in March, 2004.

- 21 -

guaranteed.  (Findings/Conclusions at 4.)  To Kmart, that fact should serve to upset the point of

Nekola's analysis, since the projected Residual Value was fully $20,218,385.  However, in his

testimony Nekola analyzed the impact upon cash flows resulting from the complete elimination

of Residual Value.  (PMCC R. 143, Tr. 12/1/05 at 77:53 to 83:43)  It is worth noting that this

analysis was provided by PMCC even though Kmart's evidence was devoid of any showing as to

what the likely values of the ten properties might be either currently or at the agreed end point in

the year 2020.

What Nekola showed was the following:

Basic Evaluation of Original Assumptions from Deeds-In-Lieu through Yr. 2020

| | |
|---|---|
| Originally projected pre-tax cash flows from 2003 through 2020: | $30,929,350 |
| Less:  Expected income tax obligations in subject period: | (19,645,254) |
| Positive total after-tax cash flow in subject period: | $11,284,096 |

Impact Upon Pre-tax Cash Flows Resulting from Elimination of Residual Value

| | |
|---|---|
| Originally projected pre-tax cash flows (see above): | $30,929,350 |
| Elimination of any residual value component: | (20,218,385) |
| As adjusted projected pre-tax cash flows: | $10,710,965 |

Impact Upon Anticipated Tax Obligations Resulting from Elimination of Residual Value

| | |
|---|---|
| Originally projected income tax obligations (see above): | $19,645,254 |
| Less:  tax savings from elimination of residual value (at 35.65% aggregate tax rate; See, Tr. 12/01/05 at 80:6 to 81:8): | ( 7,207,854) |
| As adjusted projected income tax obligations: | $12,437,400 |
| Less:  As adjusted projected pre-tax cash flows (see above): | (10,710,965) |
| Total future after-tax cash flow shortfall resulting from elimination of residual value: | $1,726,435 |

(*Id.*)

In other words, even if a zero value were assigned to the Residual Values of the subject

ten properties, only a shortfall of $1,726,435 would be present; all future taxes above that

amount would be covered by future cash flows.  (*Id.* at 82:35-51)  Again, however, no evidence

even suggested that these properties should be expected to be worthless in the year 2020.

Ultimately, PMCC's evidence demonstrated the positive future cash flows intended to be experienced. That evidence and those flows establish sufficient future free cash in this transaction to fully fund the payment of applicable future income tax duties. As such, this transaction was so structured as to self-fund income taxes throughout its term. Kmart offered no evidence to the contrary.

### (6)    Kmart's Claimed Offset Regarding Future Tax Duties Must Fail

The bankruptcy court addressed the three claimed offsets only in the aggregate. (Findings/Conclusions at 40.) In fact, as will be developed below, each is different in character. The application of PMCC's future cash flows, or free cash, to defeat the offset regarding the future tax duties is clear once the above discussion is considered. Stated simply, in order to properly preserve its critical Owner Participant's Economics, PMCC's future cash flows must be factored into to the formulaic liquidated damages model in considering the proper treatment of the asserted credit with respect to future taxes. By his testimony, Nekola established that, given the expected future cash flows, PMCC enjoyed no *net income tax benefit* from the elimination of the post deed-in-lieu taxes. Thus, Kmart's first claimed offset must be rejected.

### C.    The Application of a Credit Regarding Prior Accrued Interest Expense Violated Both the Parties' Tax Indemnification Agreement and Controlling Federal Tax Law.

The differences among Kmart's three asserted offsets are perhaps best displayed in the case of the claimed offset for so-called "accrued but unpaid interest." Here, the key questions are: (i) In the language of the bankruptcy court's decision, what "Tax Savings" is even being effected by the granting of a credit, particularly since the interest expense complained of all accrued prior to the deeds-in-lieu? and (ii) How does the credit for accrued interest fit within the controlling formulaic liquidated damages model?

Income tax laws view the realization of taxable income resulting from a deed-in-lieu of foreclosure as a forced sale of the underlying property, with the taxable gain therefore computed in accordance with the rules governing a property sale. *See, e.g., Commissioner v. Tufts*, 461 U.S. 300, 317, 103 S. Ct. 1826, 1836, 75 L. Ed. 2d 863 (1983); *Helvering v. Hammel*, 311 U.S. 504, 512, 61 S. Ct. 368, 372, 85 L. Ed. 303 (1941); *Chilingirian v. Commissioner*, 918 F.2d 1251, 1254 (6th Cir. 1990); *Allan v. Commissioner*, 856 F.2d 1169, 1172-73 (8th Cir. 1988). The proceeds realized upon the sale minus the then basis in the property yields the taxable gain in the transaction. (PMCC R. 140, Tr. 11/9/05 at 27:14-19.) In a deed-in-lieu situation, the then total amount of indebtedness forgiven constitutes the proceeds realized, from which is subtracted the property's basis to reach the taxable gain. (I.R.C. §1001; Treas. Reg. 31.1001-2(a)(1), 2(a)(4)(i); PMCC R. 140, Tr. 11/9/05 at 26:7-16; see also *Tufts*, *Helvering*, and *Chilingirian*, *supra*.) Referring back to Mahoney's Damages Model (s*ee* Section V.D., above), that Model follows this rubric.

For tax purposes, taxpayers in PMCC's position are obligated by the Internal Revenue Code to report interest expense as it accrues. (I.R.C. §163.) In fact, the very Tax Assumptions which the parties contractually agreed were to control required that the BONY interest be reported on the accrual basis. (TIA, Schedule B, Subparts (b)(ii) and (h).) Thus, by initially accruing interest, PMCC did nothing more than stay within the terms of the controlling formulaic liquidated damages model.

In structuring PMCC's Damages Model, Mahoney accordingly added the accrued interest figure to the amount of PMCC's then outstanding principal indebtedness to fix the "Amount Realized". (PMCC R. 140, Tr. 11/9/05 at 31:13-21.) Mahoney's calculation of the Amount Realized therefore served only to satisfy controlling tax law and the terms of the controlling Tax

- 24 -

Indemnification Agreement. PMCC would stress that the Mahoney Damages Model included only that interest expense which had accrued on PMCC's books prior to the deeds-in-lieu. (*Id.* at 25:21-24.) Thus, notwithstanding the apparent position of the court below, the asserted accrued interest credit is not even an item which could give rise to some future "Tax Savings".

To state the point more directly, if, as the bankruptcy court has recognized, the critical event giving rise to PMCC's indemnity entitlement was the deeds-in-lieu, how could the accrual of interest expense prior to the dates of those deeds-in-lieu support the claimed credit? The hard fact is that the controlling language of the Tax Indemnification Agreement simply will not support that conclusion. Yet, in Kmart's view, which the bankruptcy judge below adopted, the accrued interest amount must be backed out of Mahoney's calculation because Kmart stopped paying rent and accordingly PMCC never paid taxes on the portion of the rent which would have gone to pay the accrued interest. (PMCC R. 142, Tr. 11/30/05 at 117:2 to 118:19.) This somehow resulted in a "net tax benefit" realized from the deeds-in-lieu.

Resort to Isaac Sperka's testimony on this point is of no assistance. In support of his accrued interest adjustment, Sperka's testimony was as follows:

> And then there is the adjustment for the accrued but unpaid interest. And essentially the objection there is that the income inclusion of -- in respect to that amount would have, in any case, had to have been included by PMCC had the transaction gone normal, you know, continued, and that they are not harmed from -- based on the tax assumptions as a result of that item.

(PMCC R. 142, Tr. 11/30/05 at 106:15-22.)

Unless Kmart can point to other portions of the trial record not apparent to PMCC, this is the full body of Sperka's justification for the accrued interest adjustment. To the extent Kmart would suggest that reliance should also be placed upon Sperka's subsequent statements (*id.* at 116:10 to 118:19) regarding the fact that, by virtue of Kmarts' never paying the expected rents,

- 25 -

BONY never received the given interest, PMCC addresses that argument below. As this Court will see, the end result is not favorable for Kmart.

Ultimately, the manner in which PMCC has treated accrued interest is only what the tax law and the parties' Agreements required. If the Kmart position on this point is somehow intended to object to the fact that taxes were never paid on incomes that Kmart suggests would have funded the payment of that interest, its argument is flawed for the reason discussed above: PMCC's evidence established that the avoided income would have included sufficient free cash to cover those taxes. (Exhibit 137, demonstrating positive after tax cash flows in each of years 2001, 2002, and 2003).

Taking away the accrued interest as Kmart argues therefore does not reflect an adjustment for some offsetting "net income tax benefit" as a result of the deeds-in-lieu. Certainly, Sperka's testimony makes no such showing, yet the burden as to any credit was upon Kmart. To the contrary, in his testimony, Sperka acknowledged that Kmart's tax indemnity obligation turns upon the Tax Assumptions (PMCC R. 142, Tr. 11/30/05 at 62:5 to 64:13.) Again, it was on the basis of those very Tax Assumptions that Mahoney's Damages Model was constructed. In these circumstances, to nevertheless now grant Kmart this offset would serve only to take away from PMCC a tax benefit it was always intended to enjoy, and thus would run directly counter to the requirement that only "net income tax benefits reasonably expected to be realized…by reason of the circumstances or adjustments giving rise to the Loss" be allowed as offsets. The parties' liquidated damages formula cannot support that result.

In addition to his above cited justification, by his testimony Sperka would appear to argue that PMCC should be required to functionally reverse the accrued interest expense deduction because it never received the Kmart rents associated with the interest obligation and therefore

never had to pay income tax on that rent (*Id*. at 117:10 to 118:24). But if that is Kmart's basis for this claimed offset, its fundamental flaw should not be ignored: Kmart's premise for its offset regarding accrued interest thus necessarily relies upon PMCC's cash flows; the whole argument is premised upon the fact that cash flows which were to negatively impact PMCC were never paid by Kmart; accordingly, Kmart should be awarded its credit. But Kmart can't have it both ways: Cash flows cannot be considered outside the controlling liquidated damages formula when to include them would benefit to PMCC, yet those cash flows should nevertheless be fully available when the result would favor Kmart.[10]

Viewed against the terms of the controlling liquidated damages formula, and taking PMCC's cash flows into proper account, reversal of the original tax treatment of accrued interest as the bankruptcy court's ruling would require disrupts and decreases PMCC's after-tax cash flows because it was not contemplated in either the ABC Pricing Files or the Tax Assumptions under the controlling Tax Indemnification Agreements that PMCC would be required to forego the tax benefit attending the deduction of interest expense it accrued. The accruing of interest was contemplated under the ABC Pricing Files as a deduction against taxable income and, therefore, resulted in a positive impact on the after-tax cash flows. To now reverse the treatment of accrued interest from a deduction against income to an income inclusion means that PMCC will have less after-tax cash flow than originally contemplated under the ABC Pricing Files and as a component of PMCC's intended Owner Participant's Economics. Yet, in all events the controlling liquidated damages formula requires the preservation, not the depletion, of PMCC's

---

[10] On this whole issue of cash flows, Sperka himself relied upon them to make his various arguments that only the OPE of after-tax yields should be considered. Even Sperka had to concede that his yield position was itself necessarily driven by the total cash flows for the given period. (PMCC R. 143, Tr. 12/1/05 at 24:17 to 25:49.)

OPEs, specifically including its net after-tax cash flows. The asserted credit with respect to accrued interest must therefore be rejected.

Ultimately, Kmart's argument is that it is entitled to a credit in the amount of the income tax benefit PMCC had previously enjoyed by virtue of having experienced interest expense deductions without the attendant income tax on the income that, had Kmart paid it, would have funded the interest obligation. (PMCC R. 142, Tr. 11/30/05 at 118:2-24.) At best, Kmart's position is no more than the equitable argument that granting them this credit is somehow the "right" or "equitable" thing to do. However, PMCC's damages are to be determined pursuant to a liquidated damages formula. Thus, such considerations are to play no part. *See e.g., Boyle*, 518 N.Y.S.2d at 862 ("Once the parties have provided for valid liquidated damages, the sum payable becomes fixed and there is no further inquiry to be made as to possible mitigation …"). To now nevertheless grant this credit would be to apply the liquidated damages formula when favorable to Kmart, but then deny its use when the outcome would serve PMCC's interest.

**D.     The Granting of Whole Dollar Credit Upon the Unamortized Transaction Expenses Was Error**

At the time the Kmart  Structured Finance Transaction was negotiated, PMCC paid a substantial amount of fees and related expenses.  The controlling Schedule B Tax Assumptions clearly provide that those fees and expenses were to be amortized on a straight line basis over the 25-year period of the SFT.  (TIA, Schedule B, Section (b)(iii).)  Thus, a portion of the fees and expenses would be deducted each year against PMCC's income.  Sperka himself has admitted the point: "One of the tax assumptions was that those fees should be deductible ratably over the … term of the lease." (PMCC R. 142, Tr. 11/30/05 at 63:23-25, 115:10-15.)  It was never contemplated that these expenses should now instead be used to reduce the basis of the

properties. Yet, at trial, that is how Kmart defended its claimed credit regarding the unamortized fees.

Upon the issuance of the deeds in lieu of foreclosure, PMCC accelerated the balance of the unamortized fees that pertained to the subject properties and then claimed the full amount as a deduction against income. Given the deeds-in-lieu, the controlling tax laws allowed that treatment. Yet Kmart has stated that PMCC is thus "…seek[ing] to recover that benefit essentially twice." (*Id*. at 115:22 to 116:3.) However, nowhere in the evidence does Kmart show that PMCC benefited twice from this deduction. Assertions not supported by evidence are to be rejected by the trial court. *See Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 736 n.1 (7th Cir. 1999) ("Because this allegation is merely a conclusory assertion unsupported by factual assertions, we will not consider it."). At worst, only the timing of PMCC's single enjoyment of the deduction was effectively accelerated; there simply was no double benefit.

As pointed out above, the Tax Assumptions agreed to by Kmart provided for the deduction of these expenses. Such tax treatment filtered its way positively into the after-tax cash flows by serving to reduce PMCC's taxable income. To instead now add the fees and expenses to the basis in the properties as Kmart has argued effectively results in a decrease in the after-tax cash flows from the amount agreed to by the parties at the beginning of transaction. This is so because the effect of adding this amount to the basis is to remove it as an item of deductible expense, thereby ultimately reducing PMCC's after-tax cash flows. Effectively, the end result would thus be to rewrite the parties' contract in order to provide Kmart a benefit which it did not originally negotiate for itself. Such unfair and uncontemplated treatment would thus ultimately run directly counter to the controlling liquidated damages formula.

QBCHI\526540.2

At best, Kmart might have argued that there was some incremental benefit to PMCC from being able to deduct the balance of unamortized fees currently, as opposed to ratably across the intended life of the Structured Finance Transaction. Any such amount would be quite small, and no evidence of that amount was ever put forth by Kmart. In fact, in his testimony Sperka admitted that he did not apply a present value analysis in his computations regarding unamortized fees. (PMCC R. 143, Tr. 12/01/05 at 38:15-23.) Kmart's position on this point must therefore be rejected.

**E.**     **The Bankruptcy Court Erred in Granting Kmart's Asserted Credits Solely on the Testimony of Kmart's Expert Which Consisted Only of Ultimate Conclusions <u>Unsupported by any Demonstrated Analysis, Methodology or Calculations.</u>**

The bankruptcy court acknowledged that expert testimony may so lack substance as to be worthless. (*See* Findings/Conclusions at 43, citing *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 420 (7th Cir. 1990) ("[e]xpert opinions are worthless without data and reasons") (emphasis added); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process").) Therefore, before its persuasiveness can be weighed at all, expert testimony must first clear the bar set by the Seventh Circuit's precedents. As the bankruptcy court held, an expert witness "must include more than a bottom line conclusion . . . . [t]he court must be made aware of the foundation comprised of the facts, sources of information and the inferential processes the expert utilized to arrive at the opinion." (Findings/Conclusions at 43.)

Properly applying this legal standard, the court found that the testimony of Kmart's only witness – its expert, Isaac Sperka – regarding one of Kmart's asserted reductions to PMCC's claims suffered from flat "incoherence". (Findings/Conclusions at 44 (denying asserted reduction for effect of "like-kind exchange" transaction; Kmart has not appealed the denial of this reduction).) However, the bankruptcy court failed to recognize that Sperka's testimony on

- 30 -

that point – its lack of factual basis, its vagueness regarding process, and its freedom from rigorous calculation – was of a piece with his remaining testimony regarding both of Kmart's asserted accrued interest credit and the unamortized fees credit. Instead, the lower court erroneously considered Sperka's testimony on those issues, when that testimony was, as a matter of Seventh Circuit precedent, worthy of no attention from the bankruptcy court.[11]

Viewed against the Seventh Circuit standards, PMCC respectfully submits that, at least with respect to his testimony as to the dollar amount for the asserted accrued interest offset and the unamortized expense offset, Sperka's testimony is seriously flawed. Thus, when asked the question by Kmart's counsel whether a calculation was performed as to the amount of the claimed credit regarding the accrued interest, Sperka's answer was to simply look within a report which Kmart intentionally elected not to have admitted into evidence to pronounce the dollar amount of $7,307,865.26. (PMCC R. 142, Tr. 11/30/05 at 119:20 – 120:6; *see also id.* at 110:19-21 (MR. GOLDBLATT [Kmart's counsel]: "The actual reports themselves are not in evidence, and I am not seeking to admit the report."). Without the underlying report or any other display of Sperka's methodology, or even his calculations, there is simply no basis to rely upon that number. Yet the burden of proof as to any credit against the $21,080,373 amount initially established as PMCC's tax indemnity entitlement rested with Kmart.

The same point can be made with respect to the asserted credit regarding the amortized fees. There again, Sperka did nothing more than read the figure of $387,323.29 from his report.

---

[11] The Bankruptcy Court misapprehends what it describes as the "withdrawal" of PMCC's objection on this score (Findings/Conclusions at 44). During Sperka's direct examination, he sought to testify to certain specific calculations as to which work papers had not been supplied to PMCC, and PMCC objected on the ground, essentially, of unfair surprise. (PMCC R. 142, Tr. 11/30/05 at 99:22 to 104:13.) The work papers were later supplied, and PMCC withdrew *that narrow objection* as to *that testimony* (PMCC R. 143, Tr. 12/1/05 at 3:45 to 4:5), but PMCC did not waive its overall legal argument that Sperka, though qualified as an expert, supplied testimony that does not satisfy the Seventh Circuit's minimal standards for contribution of "value to the judicial process". *Mid-State Fertilizer*, 877 F.2d at 1339.

(*Id.* at 116:6-7.) Kmart's election to withhold the report without any other display of methodology, analysis or calculations renders that figure useless to the process. But since Isaac Sperka was Kmart's only witness, the bottom line is that Kmart failed to carry its burden, and neither of the two credits is properly available to offset PMCC's $21,080,373 entitlement.

## VII.   CONCLUSION

Certainly, central to the Tax Indemnification Agreement's controlling liquidated damages formula was the preservation of PMCC's Owner Participant's Economics, critically including its cash flows, or "free cash", across the period of the parties' Structured Finance Transaction. When those cash flows are taken into proper account, the unrefutted evidence establishes that sufficient future cash flows were built into the Transaction so that the avoidance of future taxes bestowed no "net income tax benefit" upon PMCC, thus defeating any credit for Kmart on that basis. Similarly, and for the additional reasons now advanced by PMCC, Kmart's claims to the accrued interest credit and the credit regarding unamortized fees must be rejected.

PMCC respectfully submits that the decision of the bankruptcy court below, to the extent it grants those three credits, should be reversed with judgment instead directed to be entered upon PMCC's claims in the *Kmart* bankruptcy proceedings in the full amount of its Tax Indemnification Agreement claim of $21,080,373 plus the amount granted by the bankruptcy court upon its Participation Agreement claim, being the additional sum of $428,998 as reimbursement of out-of-pocket expenses incurred by PMCC. As such, the total mount of the judgment now sought by PMCC's is $21,509,371.00.

QBCHI\526540.2

Respectfully submitted,

PHILIP MORRIS CAPITAL CORPORATION
and HNB INVESTMENT CORP.,


By:   /s/ Christopher Combest
                    One of Their Attorneys

Thomas J. Magill (ARDC No. 01731009)
Leonard S. Shifflett (ARDC No. 02587432)
Christopher Combest (ARDC No. 06224701)
QUARLES & BRADY LLP
500 West Madison Street
Suite 3700
Chicago Illinois 60661-2589
Telephone:  (312) 715-500

- 33 -