# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: KMART CORPORATION, *et al.*,<br><br>    Reorganized Debtors | Case No. 07 C 1926<br><br>Honorable John F. Grady |
| Philip Morris Capital Corporation and HNB Investment Corp.<br><br>    Appellants/Cross-Appellees<br><br>v.<br><br>KMART CORPORATION, *et al.*,<br><br>    Appellees/Cross-Appellants |  |

## KMART'S BRIEF ON CROSS-APPEAL AND
## RESPONSE TO CLAIMANTS' APPELLATE BRIEF

William J. Barrett (6206424)
BARACK FERRAZZANO KIRSCHBAUM
  & NAGELBERG LLP
200 West Madison Street
Suite 3900
Chicago, IL 60606
Telephone: (312) 629-5170
Facsimile: (312) 984-3150
William.Barrett@BFKPN.com

Craig Goldblatt
Michael Snyder
WILMER CUTLER PICKERING HALE &
  DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
Telephone: (202) 663-6000

Andrew Goldman
WILMER CUTLER PICKERING HALE &
  DORR LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800

June 4, 2007

## TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES ................................................................................ iii

SUMMARY OF THE ARGUMENT ................................................................... 3

STATEMENT OF THE BASIS FOR THIS COURT'S JURISDICTION ........................ 5

STATEMENT OF ISSUES PRESENTED ON CROSS-APPEAL ................................. 6

STANDARD OF REVIEW ................................................................................ 6

NATURE AND STAGE OF THE PROCEEDINGS ................................................. 6

STATEMENT OF FACTS ................................................................................. 7

    A.    Structure Of The Leveraged Lease. ................................................. 9
    B.    Documentation Of The Leveraged Lease. ........................................ 10
    C.    Sources Of An Owner Participant's Pre-Tax Return. ......................... 11
    D.    An Owner Participant's Tax Benefits. ............................................... 12
    E.    Kmart's Rejections And Subsequent Events. .................................... 14
    F.    The Trial And The Ensuing Bankruptcy Court Decision. .................... 18

ARGUMENT ................................................................................................ 20

I.     THE SECTION 502(b)(6) CAP SQUARELY APPLIES TO THE CLAIMS. ............ 20

    A.    The BNY Agreed Order Does Not Preclude Kmart From Arguing That Section 502(b)(6) Applies To The Claims, But Rather Preserved That Issue. ................................................................................... 21

    B.    The Claims Are "The Claim[s] Of A Lessor For Damages Resulting From The Termination Of A Lease Of Real Property." ....................... 27

        1.    Claimants Were The True Lessors. ........................................ 28
        2.    Claimants' Damages Resulted From Kmart's Rejections Of The Leases. .................................................................... 32

            a.    Kmart's Rejections Are The But For Cause Of Claimants' Damages ........................................... 32
            b.    The Scope Of The Statutory Cap Is Not Limited To Claims For Lost Rent Under A Lease ........................... 33

i

II.      THE BANKRUPTCY COURT CORRECTLY REDUCED CLAIMANTS'
TAX DAMAGES CLAIM TO THE TAX HARM ACTUALLY SUFFERED................35

      A.      The TIA Only Protects Claimants Against Unanticipated *Tax* Harm....................36
      B.      The Bankruptcy Court Properly Considered Kmart's Expert Testimony..............40

CONCLUSION.......................................................................................................................47

US1DOCS 6221553v3

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Arizona v. California*, 530 U.S. 392 (2000)................................................................22, 23

*Barrett v. Int'l Armaments, Inc.*, 1997 WL 639226 (N.D. Ill. Oct 6, 1997) ...................................32

*Cohen v. KB Mezzanine Fund II, LP (In re Submicron Systems Corp.)*,
    432 F.3d 448 (3d Cir. 2006)..........................................................................29

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) ..................................................29

*General Dynamics Corp. v. AT&T*, 650 F. Supp. 1274 (N.D. Ill. 1986).........................................27

*General Foods Credit Corp. v. United Airlines, Inc. (In Re UAL Corp.)*,
    2007 WL 256323 (N.D. Ill. Jan. 22, 2007)..........................................38, 39, 40

*Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    2002 WL 826956 (S.D.N.Y. May 1, 2002) ....................................................42

*Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252 (1939) ..........................................29

*In re Atlantic Container Corp.*, 133 B.R. 980 (Bankr. N.D. Ill. 1991).................................32, 35

*In re Doctors Hospital of Hyde Park, Inc.*, 474 F.3d 421 (7th Cir. 2007)..................................6

*In re Farley Inc.*, 146 B.R 739 (Bankr. N.D. Ill. 1992)..................................29, 32, 34

*In re Goldblatt Brothers, Inc.*, 66 B.R. 337 (Bankr. N.D. Ill. 1986) ..................................34, 35

*In re Interco. Inc.*, 137 B.R 1003 (Bankr. E.D. Mo. 1992).............................................30

*In re Rodman*, 60 B.R 334 (Bankr. D. Colo. 1986) .................................................30

*In re Salem*, 465 F.3d 767 (7th Cir. 2006) .........................................................6

*In re Southern Cinemas*, 256 B.R. 520 (Bankr. M.D. Fla. 2000) ...........................................30, 31

*In re Thompson*, 116 B.R. 610 (Bankr. S.D. Ohio 1990) ................................................30

*In re UAL*, 346 B.R. 783 (Bankr. N.D. Ill. 2006) .....................................................38

*In re Witte*, 841 F.2d 804 (7th Cir. 1988) ..........................................................29

*Klingman v. Levinson*, 831 F.2d 1292 (7th Cir. 1987) ..........................................23, 25, 26-27

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)......................................41, 42

*La Preferida, Inc. v. Cerveceria Modelo*, 914 F.2d 900 (7th Cir. 1990)..........................23, 25, 26

*Levinson v. Unites States*, 969 F.2d 260 (7th Cir. 1992) ..............................................23

*Lucent Technologies, Inc. v. Newbridge Networks Corp.*,
    168 F. Supp. 2d 181 (D. Del. 2001)....................................................42

*Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994)..........................................................22

*Pepper v. Litton*, 308 U.S. 295 (1939)..........................................................27, 28, 29

*Shearer v. Dunkley (In re Dunkley)*, 221 B.R. 207 (Bankr. N.D. Ill. 1998) ................................23

## STATUTES AND RULES

11 U.S.C. §§101 *et seq*..........................................................................................14

11 U.S.C. § 502(b)(6) .......................................................................... *passim*

28 U.S.C. § 158(a)(1)..........................................................................................5

Fed. R. Civ P. 26(a)(2)(B) ...................................................................................41

Fed. R. Evid. 702 ........................................................................................41, 42

## BOOKS AND ARTICLES

Bruce E. Fritch, *Leveraged Leasing*, 347 PLI/Comm (1985).......................................37

W. Page Keaton et al., *Prosser and Keaton on Torts* 266 (5th ed. 1985)....................................32

Ian Shrank & Arnold G. Gough, Jr., *Equipment Leasing-Leveraged Leasing*
    (4th ed. 2003) ...............................................................................37

US1DOCS 6221553v3

This case arises out of Kmart's rejection in bankruptcy of ten real property leases between January of 2002 and April of 2003. Those leases were entered into in 1995, when Kmart sold, and then leased-back, 16 properties as part of a "leveraged lease transaction." The counterparties to that complex transaction included Philip Morris Capital Corporation and HNB Investment Corp. (collectively, the "Claimants"), as well as the Bank of New York ("BNY").

In the leveraged lease transaction, Claimants took an equity position with respect to the properties, having made a cash investment of approximately 20 percent of the properties' value. They thus became the "Owner Participant" in the leveraged lease transaction. The remaining 80 percent of the purchase price was borrowed, through the issuance of public bonds. BNY served as the indenture trustee with respect to that bond issuance.

During its bankruptcy, Kmart closed ten of the 16 stores that were part of the leveraged lease transaction, and rejected, under Section 365(a) of the Bankruptcy Code, 11 U.S.C. § 365(a), those ten leases. Both Claimants and BNY brought claims against Kmart for damages resulting from Kmart's rejections of the ten leases.

Because the leases themselves served as collateral securing the bonds, when Kmart rejected the leases, BNY—rather than Claimants—held the right to the claim for damages for the lost stream of future rental income on the properties. BNY thus filed a claim for that lost rental income, which the parties settled as part of the bankruptcy proceeding. That settlement was reduced to an Agreed Order, to which Claimants assented, that gave BNY allowed claims in an amount calculated pursuant to 11 U.S.C. § 502(b)(6), a section of the Bankruptcy Code that limits the "claim[s] of a lessor for damages resulting from the termination of a lease of real property."

Claimants also brought claims against Kmart, seeking approximately $30 million in damages for the loss of the expected return on their investment in the ten rejected properties. Specifically, Claimants relied on two indemnity provisions that were part of the leveraged lease documentation, arguing that under a "Tax Indemnity Agreement," they were entitled to $21.08 million in damages for the loss of tax benefits, and that under a general indemnity provision, they were entitled to an additional $8.86 million for loss of other expected returns on their investment.

The bankruptcy court held a trial to resolve the value of Claimants' claims. Kmart argued, as threshold matter, that the cap imposed by section 502(b)(6) applies to Claimants' claims, since Claimants were the lessors of the properties, and their damages result from Kmart's rejections of the leases. Because BNY had already received an allowed claim up to the amount of the statutory limit, Kmart argued that Claimants' claims should be disallowed.

In the alternative, Kmart argued that Claimants had substantially over-stated the actual tax-based harm that they suffered, and that the measure of damages to which Claimants were entitled under the tax indemnity agreement was approximately $4.3 million.[1]

Kmart has also argued that the general indemnity provisions on which Claimants relied to recover their "lost equity" was intended to address third-party claims, and did not allow Claimants to recover damages for the loss of their equity in the investment.

The bankruptcy court rejected Kmart's argument regarding the applicability of the section 502(b)(6) statutory cap, but agreed with Kmart regarding the calculation of Claimants' claims under the tax indemnity agreement, and the inapplicability of the general indemnity agreement to Claimants' lost equity claim. The bankruptcy court thus entered an order granting

---

[1]      Kmart also contended at trial that the claims should be further reduced on account of a like-kind exchange into which Claimants entered. The bankruptcy court rejected Kmart's argument regarding the like-kind exchange, a conclusion that Kmart does not challenge on appeal.

2

Claimants an allowed claim, under the tax indemnity agreement, in the amount of $4.3 million.[2]

Claimants have appealed the bankruptcy court's decision to the extent that it reduced their tax-

based damages, and Kmart has cross-appealed to the extent that the bankruptcy court declined to

apply the section 502(b)(6) cap to the claims.

## SUMMARY OF THE ARGUMENT

**Kmart's Cross-Appeal: Application of the 502(b)(6) Cap.** The claims at issue are

subject to the section 502(b)(6) cap. Because Kmart paid the full claim, calculated in accordance

with the cap, to BNY, Claimants' claims should be disallowed.

The first mistake of the bankruptcy court on this issue was to conclude that an Agreed

Order resolving BNY's claims precluded Kmart from arguing that the statutory cap applies to

Claimants' claims. Since the BNY Agreed Order did not purport to resolve Claimants' claims,

the question of the applicability of the cap was not and could not have been "actually litigated."

Rather, for a consent judgment like the BNY Agreed Order to have issue preclusive effect, the

parties' intent to finally resolve the issue in question must be clear from the terms of the Agreed

Order. Just the opposite is true here, as that Order makes clear that it is "without prejudice" to

arguments that Claimants or Kmart might advance in disputes between them.

The second error was the bankruptcy court's conclusion that the section 502(b)(6) cap

does not apply to Claimants' claims on the merits. There are two elements to section 502(b)(6):

(i) a lessor's claims for damages (ii) that resulted from the termination of a real property lease.

While it is true that Claimants were not the nominal lessors of the properties Kmart rejected,

because they set up pass-through "owner trusts" to act as the nominal lessors, Claimants' were

nevertheless the true lessors. As Owner Participants, Claimants bore the economic benefits and

---

[2] The bankruptcy court also included the stipulated amount of $428,998 for Claimants' out-of-pocket expenses, a determination that Kmart did not contest. As such, it entered an order providing an allowed claim in the

burdens of owning the properties, received the rent from Kmart in excess of the portion allocated to pay down the mortgage debt owed to BNY, and were treated as the owners of the properties for tax purposes. It thus elevates form over substance to decline to treat Claimants as anything other than the lessors of the properties.

The second prong of section 502(b)(6) is also met, since the damages Claimants seek undoubtedly *resulted from* Kmart's lease rejections. The bankruptcy court mistakenly relied on the fact that Claimants *theoretically* could have incurred tax damages that would not have been caused by Kmart's rejections, when in fact the damages sustained by Claimants did result from the rejections. To that end, it is telling that of the sixteen properties that were leased-back to Kmart, damages were only sought for the ten properties that Kmart rejected. The reason for this is plain, Claimants' damages *resulted from* Kmart's rejections. The bankruptcy court also erred by finding it important that Claimants' damages were not for lost rent under the leases, failing to appreciate that the section 502(b)(6) cap is routinely applied to damages beyond lost rent.

**Claimants' Appeal: Calculation of the Claims.** If the Court were to determine that the Claims are not subject to the section 502(b)(6) cap, the Court should affirm the bankruptcy court's calculation of the Claims. In substance, the bankruptcy court reduced Claimants' tax-based damages to the amount of tax harm Claimants actually suffered, as the language of the tax indemnity agreement unambiguously requires. Claimants' interpretation would convert the parties' tax agreement—which, by its title and terms, is meant to indemnify Claimants only for their tax harm—into a broad guarantee of Claimants' expected return on their investment. As the bankruptcy court properly held, the agreement provides for nothing of the sort.

---

total amount of $4,737,624. (Op. at 48.)

Nor is there merit to Claimants' argument that Kmart's expert witness (who proposed certain adjustments to Claimants' tax damage model and explained how the tax damages should actually be calculated) failed to provide sufficient information regarding the mathematical calculations that underlie his tax adjustments.  Claimants' own trial witness (their in-house tax counsel) agreed to the correctness of those calculations.  Kmart's witness provided a detailed expert report in discovery that set out his methodology and calculations in full detail.  Claimants had every opportunity to challenge Kmart's witness, through cross-examination, regarding those calculations, and elected not to.  Claimants' argument that Kmart failed to provide sufficient evidence of the mathematical calculations is sheer makeweight.  If this Court were to determine that the Claims are not subject to the section 502(b)(6) cap, the bankruptcy court's calculation of the Claims should be affirmed.

## STATEMENT OF THE BASIS FOR THIS COURT'S JURISDICTION

The bankruptcy court entered the Order that is the subject of this cross-appeal on February 13, 2007 (Appellants' Designation ("AD") 150).[3]  That Order reflects the Court's contemporaneously issued Findings of Fact and Conclusions of Law (AD 151, hereinafter referred to as the "Opinion," or cited as "Op. at __.")  Claimants timely appealed the February 13 Order by filing a notice of appeal on February 26, 2007 (AD 155), and Kmart timely cross-appealed by filing its notice of cross-appeal on March 1, 2007.  (CD 27.)  This Court has jurisdiction over Claimants' appeal and Kmart's cross-appeal pursuant to 28 U.S.C. § 158(a)(1).

---

[3]      Appellants' Designations are cited herein as (AD [Item No.]).  Cross-Appellant's Designations are cited as (CD [Item No.]).  References to a particular page, paragraph, or provision of a document are cited as (AD/CD [Item No.] at __).  References to a trial or a hearing transcript are cited as (AD/CD [Item No.], [Date of Transcript] at [page] (name of testifying witness)).

## STATEMENT OF ISSUES PRESENTED ON CROSS-APPEAL

This cross-appeal presents the following issues:

1.     Did the bankruptcy court err in finding that the Agreed Order resolving certain claims brought against Kmart by BNY (AD 58) precludes Kmart from arguing that the proofs of claim filed by Claimants are subject to the cap on damages set forth in 11 U.S.C. § 502(b)(6), in light of the facts that the applicability of the statutory cap to Claimants' claims was not actually litigated, and that the terms of the BNY Order state it is without prejudice to Kmart's objections and defenses to Claimants' claims; and

2.     Did the bankruptcy court err in finding that the cap on damages set forth in 11 U.S.C. § 502(b)(6) does not apply, on the merits, to the proofs of claim filed by Claimants.

## STANDARD OF REVIEW

The bankruptcy court's conclusions of law are reviewed *de novo*, and its findings of fact are reviewed for clear error.  *See In re Doctors Hosp. of Hyde Park, Inc*., 474 F.3d 421, 426 (7th Cir. 2007); *In re Salem*, 465 F.3d 767, 773 (7th Cir. 2006).

## NATURE AND STAGE OF THE PROCEEDINGS

Kmart filed for bankruptcy on January 22, 2002. (Joint Pre-Trial Statement ("JS") at 26 (AD 138).)[4]  Between January 22, 2002 and April 17, 2003, Kmart rejected ten property leases that were executed as part of the "leveraged lease transaction" that Kmart had entered with Claimants and certain third parties in May of 1995.  (JS at 27; AD 1-14, 21-23, 35-45, 47-56.)

---

[4]     The Joint Pre-Trial Statement, which includes a section entitled "Joint Statement of Undisputed Facts", was prepared jointly by Claimants and Kmart and filed with the bankruptcy court on Nov. 1, 2005.  It is cited herein simply as JS (without repeatedly referring to its designation at AD 138).

Between July 31, 2002 and June 5, 2003, Claimants filed proofs of claim (the "Claims"),[5] seeking damages arising from Kmart's rejections of the ten leases.  (JS at 27-28, AD 24-34.)

On February 2, 2004, Kmart filed its Nineteenth and Twentieth Omnibus Objections to Claims, in which it asserted objections to the Claims, including the objection that the Claims were improperly calculated.  (AD 15-16.)  On September 30, 2005, the bankruptcy court granted Kmart leave to amend those objections.  In its amended objection, Kmart also asserted that the Claims should be subject to the cap on damages set forth in 11 U.S.C. § 502(b)(6).  (CD 16.)

The bankruptcy court held a five-day bench trial on the contested Claims in November and December of 2005.  (AD 139-143.)  On February 8, 2006, the court heard the parties' closing arguments (AD 144) and, on February 13, 2007, entered six Orders resolving the status of the contested Claims and several trial-related motions.  Claimants' appeal, and this cross-appeal, are both from the bankruptcy court's Orders resolving the contested Claims.  (AD 150.)

## STATEMENT OF FACTS

On May 4, 1995, Kmart, Claimants, and certain third parties entered into a complex arrangement involving sixteen properties, then owned by Kmart, under which the properties were sold and then leased-back to Kmart (the "Leveraged Lease Transaction," or "Transaction").  This type of transaction was a "commonly used financing tool in that time period."  (Op. at 2 n.2; AD 132 at 3, ¶ 3).

Claimants were the "Owner Participant" in the Transaction.  (AD 139, 11/8/05 Tr. at 108 (Seagriff).)  From the perspective of an Owner Participant, the principal purpose of a leveraged lease is to invest in equipment or real estate, while deferring the payment of tax—taxes both

---

[5]    Claimants initially filed eleven proofs of claim, and subsequently agreed to withdraw six of the eleven, leaving five claims outstanding for the bankruptcy court to ultimately resolve.  (Op. at 1 n.1; JS at 27.)  The five outstanding claims are numbered:  50110 (AD 24), 50111 (AD 25), 50112 (AD 26), 50113 (AD 27), and 50863 (AD 34).

from the income generated by the investment, as well as taxes due from other income. (AD 140, 11/9/05 Tr. at 88-89 (Mahoney).)

These tax benefits are obtained because the Owner Participant is permitted to take tax losses in the early years of a leveraged lease, primarily because it is able to depreciate the real estate or equipment it has "purchased," and can also take an interest expense for the amounts it has borrowed to finance the investment. While the investment will generate taxable income in the later years of the transaction, the *deferral* of taxable income to later years provides a substantial tax benefit. (AD 141, 11/10/05 Tr. at 328 (Naughton).)

In addition to this tax benefit, an Owner Participant also receives a portion of the rent stream—paid by the initial owner of the property (who is leasing it back)—that is left-over after the bulk of each rent payment is allocated to pay down the debt incurred to acquire the property. (AD 142, 11/30/05 Tr.[6] at 24-27 (Sperka); AD 139, 11/8/05 Tr. at 138 (Nekola).) This excess rent is called "free cash." (AD 139, 11/8/05 Tr. at 113 (Seagriff).)

The original owner of the property—here, Kmart—sells the property and then becomes the lessee. The original owner benefits from the transaction by receiving cash for the property, that it is able to use to satisfy its need for capital. (*Id*. at 112). From that perspective, the transaction is the economic equivalent of a borrowing, with the lease rate reflecting an implicit interest rate on that borrowing. Because of the tax benefits associated with this transaction, however, the cost of capital from the original owner's perspective may well be lower than that offered by the lessee's other borrowing options. (AD 141, 11/10/05 Tr. at 263-65 (Naughton).)

---

[6]    Starting on page 66 of the 11/30/05 Transcript (AD 142), each page of the transcript has two different page numbers (one number is in the far upper right-hand corner of the page, and the other number is in that same corner but is closer to the text). References to such pages of that transcript herein cite to the page number that is closer to the text.

US1DOCS 6221553v3

A.      **Structure Of The Leveraged Lease.**

The first step in the Leveraged Lease Transaction here was Claimants' establishing

sixteen separate owner trusts ("Owner Trusts"), and then Kmart selling estates-for-years interests

in sixteen properties to the sixteen Owner Trusts for $169,492,251 through an Agreement for

Sale of Real Estate, dated May 4, 1995.[7] (AD 4; JS at 23; AD 139, 11/8/05 Tr. at 108-09

(Seagriff).) On the same date that the Owner Trusts took title to the properties, the Owner Trusts

leased the properties back to Kmart via sixteen separate lease agreements (the "Leases"). (JS at

24; AD 5-14; AD 139, 11/8/05 Tr. at 112 (Seagriff).)

The funds to purchase the properties came from two sources: (i) Claimants' initial equity

investments and (ii) the acquisition of non-recourse public bond debt (the "Mortgage Debt"),

pursuant to which the Owner Trusts entered into an Indenture, Mortgage and Deed of Trust,

Assignment of Rents and Security Agreements (the "Indenture"), also dated May 4, 1995, with

BNY. (JS at 25; AD 47-56.) Pursuant to the Indenture, BNY's loan was secured by the property

via a mortgage, and by the Leases themselves. (*Id*.)

The aggregate sale price for the ten properties that were the subjects of the Leases that

Kmart ultimately rejected was approximately $115 million. (Op. at 3; AD 142, 11/30/05 Tr. at

22-23 (Sperka); AD 143, 12/1/05 Tr. at 74 (Nekola).) Claimants made an equity investment for

approximately $22 million—or 20 percent—of this purchase price. (AD 143, 12/1/05 Tr. at 74

(Nekola).) Thus, the non-recourse Mortgage Debt lent by BNY for the ten rejected properties

was approximately $93 million, or 80 percent of the purchase price. (*Id*.)

A crucial component in leveraged lease transactions is the Owner Trust's status as a

"pass-through entity." For Federal income tax purposes the Owner Trust's existence is ignored,

---

[7]      Remainder interests in the properties were sold to a third party, the RemainderMart Trust, for $583,104.
(JS at 23.)

and the Owner Participant is deemed to be the owner and lessor.  (AD 141, 11/10/05 Tr. at 322-23 (Naughton); AD 2 at B-1(a).)  As a result, the tax benefits of owning the property are enjoyed by the Owner Participant.  (AD 141, 11/10/05 Tr. at 263-65, 322-23 (Naughton); AD 143, 12/1/05 Tr. at 6 (Sperka); AD 2 at B-1(a).)

### B.    Documentation Of The Leveraged Lease.

A typical leveraged lease is documented by several writings.  First is the Owner Trust Agreement, pursuant to which the Owner Participant establishes the Owner Trust.  (AD 35-45.) This agreement typically gives the Owner Participant control over virtually all decisions regarding the property.  (AD 142, 11/30/05 Tr. at 43 (Sperka).)  It also typically includes terms regarding the distribution of "free cash" (the amount of rent left over after the Mortgage debt is serviced) to the Owner Participant. (*Id*.)

Next is the Agreement of Sale of Real Estate, pursuant to which the Owner Trust acquires an estate-for-years interest in the property, as the sixteen Owner Trusts did with respect to the sixteen properties here.  (JS at 23; AD 4.)

Third, the Owner Trust enters a lease with the original owner of the property.  Under the ten Leases at issue here (each materially identical, with twenty-five year terms), Kmart was obligated to make periodic rental payments to the Owner Trusts.  (JS at 26; AD 5-14.)

Fourth, another common component of a leveraged lease is a tax indemnification agreement.  Here, Kmart entered into two separate, but materially identical, tax indemnification agreements, both dated May 4, 1995: one with Philip Morris Capital Corporation, and the other with HNB Investment Corp. (the "TIA").[8]  (JS at 24, AD 2-3.)  The TIA allocates risk among its signatories for certain tax events that may occur.  (AD 142, 11/30/05 Tr. at 46-47 (Sperka).)

---

[8]    These two agreements are nearly identical and are referred to here as one document, the "TIA."

Finally, there is typically a Participation Agreement, as there was here, dated May 4, 1995, amongst Kmart, Claimants, and all the other parties to the transaction. (JS at 24; AD 1.) The Participation Agreement is the document that contains the definitions used in many of the other documents, and also contains a general indemnity provision under which the lessee agrees to indemnify other parties to the transaction for certain losses. (AD 142, 11/30/05 Tr. at 45-46 (Sperka).)

### C. Sources Of An Owner Participant's Pre-Tax Return.

An Owner Participant to a leveraged lease—in addition to the tax benefits associated with the transaction—expects to receive a certain amount of "pre-tax cash flow," which is made up of two elements: (1) the return from the so-called "free cash" from the rent, and (2) the residual value of the property at the conclusion of the transaction. (*Id.* at 26-27; AD 139, 11/8/05 Tr. at 138 (Nekola).)

*Free Cash*: In this case (as in a typical leveraged lease), the majority of the rent that the Owner Trusts received from Kmart went to BNY to pay down the Mortgage Debt, and the rent in excess of that amount was distributed by the Owner Trusts to Claimants (the Owner Participant) as free cash. (AD 142, 11/30/05 Tr. at 24-26 (Sperka); AD 139, 11/8/05 Tr. at 113 (Seagriff).)

*Residual Value*: An Owner Participant also expects to derive a return on its investment from its ownership of the property, obtaining any remaining—or residual—value of the property at the conclusion of the lease term. (AD 139, 11/8/05 Tr. at 114-15 (Seagriff).) The residual value of the property is projected at the outset of the leveraged lease transaction. (*Id.*) In this case, the residual value was projected to be 17.5% of the total initial purchase price, or just over $20 million for the ten properties that Kmart rejected. (AD 142, 11/30/05 Tr. at 29 (Sperka).) The Owner Participant, however, expressly assumes the risk that the ultimate residual value of

11

the property may differ from what is projected at the outset. (AD 139, 11/8/05 Tr. at 114-15 (Seagriff); AD 1 at 49 § 22(g); Op. at 4, 7.)

> **D.    An Owner Participant's Tax Benefits.**

The tax benefits of the transaction are the other source of the Owner Participant's return. The Owner Participant receives an anticipated after-tax rate of return, or "after-tax yield," from its combined return on the free cash, residual value, and tax benefits. (AD 139, 11/08/05 Tr. at 114 (Seagriff).)  The tax benefits stem from the fact that, because the Owner Trust is a pass-through entity for tax purposes, the Owner Participant is treated as the owner of the property and is entitled to certain tax deductions associated with ownership.  (AD 142, 11/30/05 Tr. at 33-34 (Sperka); AD 141, 11/10/05 Tr. at 322-23 (Naughton).)

*Depreciation Deductions*:  Tax depreciation for real property is similar to tax depreciation for equipment; a depreciation schedule that is set by law allows an Owner Participant to depreciate the real property over a period of time that may in fact be shorter than the useful life of the property.  (AD 142, 11/30/05 Tr. at 32-33 (Sperka).)  Importantly, the Owner Participant may take the depreciation deductions for the *entire purchase price* of the property, even though the Owner Participant's equity investment is only a small percentage of that amount (here, approximately 20% for the ten properties at issue). (*Id*. at 22-23, 33-34.) Thus, over the life of the transaction, Claimants were entitled to take depreciation deductions on the full purchase price of the ten properties ($115 million).  (AD 139, 11/8/05 Tr. at 114 (Seagriff).)

*Amoritization Deductions*:  Pursuant to the terms of the Transaction and applicable tax law, Claimants were also entitled to amortization deductions, on a straight-line basis over the

12

term of the transaction, for the expenses (such as fees) they incurred in connection with entering into the transaction in the first instance.  (JS at 26.)

*Interest Deductions*:  Since the Owner Participants are also treated as the borrower of the Mortgage Debt, they are also entitled to take deductions for interest payments made on the debt. (AD 142, 11/30/05 Tr. at 34 (Sperka).)  The Owner Participant enjoys these interest deductions even though the interest payments are made by the Owner Trust to the lender with the proceeds from the lessee's rent payments.  (*Id.* at 117.)

In addition, it should be noted that the interest deduction is taken at the time that interest is *accrued*, regardless of whether payment on that accrued interest is actually made. Accordingly, Claimants were allowed to deduct—and did deduct—interest as it accrued on the Mortgage Debt. (JS at 26.)

The bulk of the tax deductions associated with the property are taken early in the course of the transaction.  These deductions shield from taxation not only the Owner Participant's income from the transaction, but also permit the Owner Participant (and related companies) to shield from taxation income derived from other sources. (AD 140, 11/9/05 Tr. at 88-89 (Mahoney).)  For this reason, affiliates of profitable business enterprises that generate revenues that would otherwise be subject to corporate income tax are often Owner Participants in leveraged lease transactions; while owners of real estate whose businesses do not generate sufficient revenues to permit them to take advantage of the various tax deductions are often sellers and tenants in these sale and lease-back transactions.

At bottom, the leveraged lease transaction operates to create a tax deferral.  By the end of the transaction, the remaining depreciation deductions are typically insufficient to shelter the entire amount of rental income, and the transaction serves to generate taxable income. (AD 139,

11/08/05 Tr. at 114 (Seagriff); AD 142, 11/30/05 Tr. at 38-39 (Sperka).)  But by effectively

deferring taxes that would otherwise be due today to some date in the future, the transaction

serves to defer the payment of taxes, which deferral (in light of the time value of money) is one

of the critical benefits for an Owner Participant.  (AD 142, 11/30/05 Tr. at 36 (Sperka).)

     **E.**     **Kmart's Rejections And Subsequent Events.**

On January 22, 2002, Kmart and certain of its affiliates filed for bankruptcy protection

under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq*. (JS at 26.)  On

April 25, 2003, the Court entered an Order confirming the First Amended Joint Plan of

Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors-in-Possession, as

amended (the "Plan").  (*Id.* at 28.)  The effective date of the Plan was May 6, 2003. (*Id.*)

*The Rejections and Claimants' Claims*:  Between January 2002 and April 2003, Kmart

rejected ten of the sixteen property Leases that were part of the Leveraged Lease Transaction.

(*Id.* at 27.)  Because of Kmart's rejections, Claimants' return from the free cash, residual value

and tax benefits of the transaction was interrupted. (AD 142, 11/30/05 Tr. at 56 (Sperka).)

Between July 31, 2002 and June 5, 2003, Claimants filed proofs of claim against Kmart

to recover damages. (JS at 27.)  Their claim for their lost tax benefits was based on the TIA.

Claimants' claim for the loss of the equity value of their investment, and their claim for

reimbursement of certain expenses, was based on the indemnity provision contained in the

Participation Agreement. (Op. at 14.)  Claimants only sought damages related to the ten

properties that Kmart rejected; they sought no damages for the six properties that Kmart did not

reject.  (AD 141, 11/10/05 Tr. at 226-27 (DeVoss); AD 46.)

*The Deeds In Lieu of Foreclosure*:  Because the rejections would end Kmart's obligation

to make its rent payments (the proceeds of which would primarily have been used to pay down

14

the loans), the lenders were entitled (by virtue of the mortgages) to foreclose on the properties themselves. Accordingly, between May 2003 and March 2004, the Owner Trusts executed deeds in lieu of foreclosure with respect to each of the ten rejected properties, thereby transferring the estate-for-years interest in each of those properties to BNY in satisfaction of the outstanding Mortgage Debt. (JS at 29; AD 93-102.) The residual value of the ten properties, if any, was also tendered to BNY by the deeds in lieu of foreclosure. (AD 142; 11/30/05 Tr. at 56 (Sperka).) At the time of the rejections, however, the fair market value of the ten properties was less than the amount of the unpaid principal and accrued but unpaid interest of the outstanding Mortgage Debt for the ten properties. (JS at 29.)

The satisfaction of the outstanding Mortgage Debt, via the deeds in lieu of foreclosure, was treated by tax law as a sale of the properties. (AD 140, 11/9/05 Tr. at 22-23 (Mahoney).) In connection with that "sale," Claimants received forgiveness of indebtedness income, in the amount of the outstanding principal and interest on the loan. (*Id.* at 94-95.)

*The BNY Claims and the Agreed Order*: As soon as Kmart filed for bankruptcy—and before Kmart rejected the Leases—BNY, rather than the Owner Trusts, began receiving the rent payments directly from Kmart. BNY thus captured for itself, as it was entitled to do under the terms of the Indenture, the rent for the ten ultimately rejected properties. (*Id*. at 106.)

Following the rejections, BNY also filed proofs of claim against Kmart for damages resulting from Kmart's rejections of the ten Leases. (Op. at 10.) After negotiations amongst Kmart, BNY, and other claimholders, on September 26, 2003 the bankruptcy court entered a consent order that granted, *inter alia,* allowed claims to BNY in a stipulated amount calculated pursuant to section 502(b)(6) of the Bankruptcy Code. (AD 57; Op. at 12.)

15

As part of that consent order, Kmart was directed by the bankruptcy court to serve copies of the consent order on counsel of record for the Owner Trusts and Claimants, who then had ten days to "file any objection to the allowance and payment of" the claims that BNY was being granted. (Op. at 12.) Shortly thereafter, Kmart, BNY, and Claimants agreed to amend the consent order, and, on November 3, 2003, the bankruptcy court entered an Amended Order with respect to the BNY claims (the bankruptcy court refers to this Order as the "Agreed Order," and it will be referred to as such, or as the "BNY Agreed Order," hereinafter). (*Id.* at 12-13; AD 58.)

As with the prior Order, BNY's claims that were allowed under the Agreed Order were limited by the section 502(b)(6) cap. (JS at 28; AD 58.) In addition, the Agreed Order states that the BNY claims "do not include" any claims Claimants might have for indemnification or expenses, and that Claimants' Claims "shall not include" any claims for damages that would be subject to section 502(b)(6). (AD 58 at 3.) The Agreed Order also expressly states that it is "without prejudice to . . . any and all claims [of] the . . . Owner Participants [Claimants] . . . under any Participation Agreement [or] Tax Indemnification Agreement . . . and [to] any and all defenses, objections and counterclaims the Debtors [Kmart] may have to [such claims] . . . ." (*Id.*)

*The Tax Effects Of The Rejections*: As a result of Kmart's rejections, the leverage lease transaction was interrupted at the point when Claimants had received a substantial portion of the free cash and virtually all the benefits of the tax deferral for the ten rejected properties. (AD 142, 11/30/05 Tr. at 42, 57 (Sperka).) As stated above, the deeds in lieu of foreclosure for the ten rejected properties satisfied the underlying Mortgage Debt owed to BNY and were treated as a sale of the ten properties for tax purposes; thus, Claimants incurred taxable income equal to the then outstanding principal and interest owed to BNY. (AD 140, 11/9/05 Tr. at 22-23, 94-95

16

(Mahoney).) This tax effect of the rejections is the predicate for Claimants' requested tax damages. (Op. at 39; AD 141, 11/10/05 Tr. at 317 (Naughton).)

The rejections, however, also had three other significant tax effects that served to mitigate the tax harm incurred by Claimants resulting from the rejections. (Op. at 39.)

*First*, while the deeds in lieu of foreclosure resulted in immediate "debt forgiveness" income to Claimants equal to all of the then-outstanding principal and interest on the Mortgage Debt, had the transaction not been interrupted, Claimants would still have had to pay—over the life of the transaction—the same nominal amount of tax, which would have been associated with paying down the outstanding debt over the remaining term of the Transaction. (AD 140, 11/9/05 Tr. at 94-95 (Mahoney).) In this respect, Kmart's rejections—which triggered the deeds in lieu of foreclosure—only *accelerated* Claimants' tax liability, they did not create it.

*Second*, because of the interruption of the Transaction, Claimants were able to, and did, take an immediate accelerated tax deduction for the remaining unamortized transaction fees that would have otherwise been deductible over the remaining term of the transaction. (*Id.* at 99-100.) Thus, they were able to take certain deductions earlier than they otherwise would have.

*Third*, between the time when Kmart rejected the ten properties, and the execution of the deeds in lieu of foreclosure, Claimants continued to take income tax deductions for the interest that accrued on the Mortgage Debt. (*Id.* at 120-21.) But during that time, Kmart's rent payments were going directly to BNY. Claimants thus did not recognize as income the rent that would have gone to the Owner Trusts to pay the interest, and did not in fact pay any of the interest that was owed. (*Id.*) But even though the interest was not actually paid, Claimants nevertheless claimed interest deductions because the interest obligations continued to *accrue*.

17

The forgiveness of the debt resulting from the deeds in lieu required that these amounts be reconciled. That is, Claimants were required to take into income the amount of accrued but unpaid interest for which they had already taken deductions, but had not recognized income. (*Id.* at 121-23.) Had the Transaction gone to term, Claimants would have taken the same interest deductions that they in fact took when the interest obligations accrued, but they also would have had to take into income the corresponding amount of rent—that would have been allocated to pay the interest—as of the time the Owner Trusts would have received it. (*Id.*)

*Claimants' Consolidated Damage Model*: On February 28, 2005, Claimants served their Rule 26(a) Initial Disclosures on Kmart. (AD 46.) These disclosures provided a consolidated damage model that asserted an aggregate claim of $30,374,127 for the ten rejected properties. (AD 46; JS at 31-32.) This amount was made up of $8,864,756 for Claimants' equity-based damages,[9] $21,080,373 for Claimants' tax-based damages, and $428,998 for the recovery of certain transactional expenses. (*Id.*)

*Kmart's Objections To The Claims*: On September 30, 2005, this Court entered an Order allowing Kmart to amend its objections to the Claims. (CD 16.) Accordingly, Kmart's amended objections were filed on October 13, 2005. (AD 18.) At the time of the trial in November of 2005, Kmart's objections were: (1) that the cap on damages set forth in section 502(b)(6) of the Bankruptcy Code should be applied to the Claims, and, in the alternative, (2) that the damages requested by Claimants were miscalculated and overstated. (JS at 32; AD 18.)

**F.    The Trial And The Ensuing Bankruptcy Court Decision.**

At trial, Kmart argued that the section 502(b)(6) cap should be applied to Claimants' Claims because Claimants are the true lessors, and because the damages Claimants seek all result

---

[9]    At trial Claimants reduced their lost-equity claim to $8,609,824. (AD 141, 11/10/05 Tr. at 202-03 (DeVoss).)

from Kmart's rejections of the ten Leases. *See* 11 U.S.C § 502(b)(6) (the cap applies to "[t]he claim[s] of a lessor for damages resulting from the termination of a lease of real property.").

Alternatively, Kmart argued that the Claims should be reduced so that they would reflect the actual tax harm Claimants suffered as a result of Kmart's rejections. (Op. at 19-20.)[10] Specifically, Claimants requested tax damages equal to the tax liability they incurred from the forgiveness of the Mortgage Debt, subject to a "gross-up" of that amount to account for the fact that the recovery on such a claim would itself be taxable. (AD 141, 11/10/05 Tr. at 317 (Naughton).) At trial, Kmart argued—pursuant to the express terms of the TIA indemnity provision upon which Claimants were relying—that three specific adjustments needed to be made to Claimants' requested tax damages so that the award merely made them whole, rather than provided a windfall, from a tax perspective. (Op at 19, 39-40.)

*First*, Kmart contended that the Claims had to be reduced by $9,076,559 to account for the present value of the taxes that Claimants would have had to pay on the income from the rent that would have been allocated to pay down the Mortgage Debt had the Transaction gone to term. (AD 142, 11/30/05 Tr. at 114 (Sperka).) *Second*, Kmart contended that the Claims had to be reduced by $387,323 to account for the accelerated deductibility of transaction expenses. (*Id*. at 116.) *Third*, Kmart contended that the Claims had to be reduced by $7,307,865 to account for the fact that Claimants would have had to recognize income from the interest payments on the debt had the Transaction gone to term. (*Id*. at 120.)

The bankruptcy court rejected Kmart's argument regarding the application of the cap on damages set forth in 11 U.S.C. § 502(b)(6), holding that the BNY Agreed Order precludes Kmart from arguing that the Claims are subject to the cap. (Op. at 29-31.) The bankruptcy court also

---

[10]     Kmart also argued that Claimants were not contractually entitled to any equity-based damages.

19

found, on the merits, that that the statutory cap would not apply to the Claims in any case. (*Id*. at

31-35.) Kmart challenges these two conclusions of the bankruptcy court in this cross-appeal.

The bankruptcy court, however, accepted Kmart's alternative argument that Claimants'

tax damage model was flawed, and adopted Kmart's three adjustments.[11] Accordingly, the Court

allowed Claimants a "Class 5 Claim" (as defined in Kmart's bankruptcy Plan)[12] of $4,308,626

for the tax-based harm they suffered.[13] (*Id*. at 42-46.) Claimants have appealed the bankruptcy

court decision to the extent it reduced the amount of their requested tax damages.[14]

## ARGUMENT

## I.     THE SECTION 502(b)(6) CAP SQUARELY APPLIES TO THE CLAIMS.

As the bankruptcy court in this case explained:

> Under the Bankruptcy Code, a landlord's claim for damages arising out of
> the termination of a lease is computed by determining the amount of
> damages provided for under applicable state law and applying the ceiling
> on that amount in accordance with section 502(b)(6) of the Code. . . .  The
> ceiling is applied, even if the debtor can afford to pay the noncapped
> claim. . . .  The need for a section 502(b)(6) cap [arises from that fact that]
> [a]llowing a landlord's full claim for damages resulting from the
> termination of a long-term lease caused by rejection would swamp the
> unsecured creditor class and likely thwart reorganization efforts.  On the
> other hand, a landlord is entitled to compensation. . . .  Section 502(b)(6)
> is a compromise between these two competing concerns.

(*Id*. at 31-32 (citations omitted).)

---

[11]     The bankruptcy court did not agree with Kmart that Claimants had mitigated their tax damages through certain "like-kind exchange" transactions.  (Op. at 44-45.)  Kmart does not appeal this aspect of the bankruptcy court's Order.  *See also supra* n.1.

[12]     Kmart has stipulated that, to the extent Claimants are granted an allowed claim, it will be treated as a Class 5 Claim under the Plan.  (*Op*. at 15.)

[13]     The bankruptcy court added the stipulated amount of $428,998 to the allowed claim, to account for Claimants out-of-pocket expenses, for a total allowed claim of $4,737,624.  (*Op*. at 48.)  *See also supra* n.2.

[14]     The bankruptcy court rejected Claimants' argument to recover lost equity, a determination that Claimants do not appeal.

As the bankruptcy court stated, "[t]he two predicates for triggering the use of section 502(b)(6) are (i) a claim of a lessor and (ii) [the] damages result[] from termination of a real property lease." (*Id*. at 32.) In this case, the section 502(b)(6) cap should be applied to the Claims since (i) Claimants were the true lessors of the properties, and (ii) all of Claimants' requested damages resulted from Kmart's rejections of the Leases.

As a threshold matter, the bankruptcy court was mistaken in concluding that the Agreed Order resolving certain claims brought against Kmart by BNY precludes Kmart from even arguing that the cap applies here. The bankruptcy court also erred by separately finding that— notwithstanding the averred issue preclusive effect of the BNY Agreed Order—the section 502(b)(6) cap does not apply to the Claims on the merits.

Kmart addresses each of these mistaken conclusions in turn.

## A. The BNY Agreed Order Does Not Preclude Kmart From Arguing That Section 502(b)(6) Applies To The Claims, But Rather Preserved That Issue.

The BNY Agreed Order explicitly states that it is "without prejudice to . . . any and all claims that the . . . Owner Participants [Claimants] have asserted . . . . and [to] any and all defenses, objections and counterclaims the Debtors [Kmart] may have to [such claims] . . . ." (AD 58 at 3.) It further states that Claimants' Claims "shall not include damages of the lessors resulting from termination or rejection of the . . . Leases that are subject to the limit set forth in Section 502(b)(6), which claims shall be held exclusively by . . . BNY." (*Id*.) From this latter language, the bankruptcy court came to the faulty conclusion that Kmart is foreclosed from arguing that the section 502(b)(6) cap applies to Claimants' Claims. (Op. at 29-31.) This holding is inconsistent with the terms of the Agreed Order and with the doctrine of issue preclusion, which requires that an issue be actually litigated in order for it to be precluded.

At its core, issue preclusion "forbids litigants from relitigating issues actually resolved in an earlier proceeding." (*Id*. at 29 (*quoting Amer. Nat'l Bank & Trust Co. v. City of Chicago*, 636 F. Supp. 374, 377 (N.D. Ill. 1986)).) To that end, there are four elements that are required in order for issue preclusion to apply (which the bankruptcy court correctly identified): "'1) the issue [being precluded] . . . must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action.'" (*Id.* (*quoting People Who Care v. Rockford Bd. Of Educ.*, 68 F.3d 172, 178 (7th Cir. 1995))); *see also Arizona v. California*, 530 U.S. 392, 414 (2000) ("[I]ssue preclusion attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'") (quoting Restatement (Second) of Judgments § 27, p. 250 (1982)).

It is well established that "[i]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated." *Arizona*, 530 U.S. at 414; *see also Meyer v. Rigdon*, 36 F.3d 1375 (7th Cir. 1994) ("In order to invoke collateral estoppel, an issue must have been 'actually litigated' in the prior action. Accordingly, default judgments are not given preclusive effect . . . [n]or are most consent decrees."). As the bankruptcy court noted, "the 'actual litigation' element is of particular concern when a consent judgment is involved." (Op. at 29.)

As the bankruptcy court also explained, a consent judgment will have issue preclusive effect only "where [the] parties have indicated clearly the intention that the decree to be entered shall . . . determine finally certain issues." (*Id*. at 30 (citing cases).) In this regard, the bankruptcy court correctly emphasized that a party's "intent to give conclusive effect is gleaned

from the language of the consent judgment" itself. (*Id.* (*citing Klingman v. Levinson*, 831 F.2d

1292, 1296 (7th Cir. 1987)).) In short, to have issue preclusive effect a consent judgment must

be clear regarding the parties' intent, so that it creates an exception to the general rule that

"consent judgments ordinarily support claim preclusion *but not issue preclusion*." *Arizona*, 530

U.S. at 414 (holding that the claims for increased water rights asserted by certain Native

American Indian tribes were not precluded by a consent judgment) (emphasis added).[15]

    While the bankruptcy court acknowledged that the BNY Agreed Order should only be

given issue preclusive effect if the parties' intent to resolve the section 502(b)(6) cap issue was

expressed in the Order's plain terms, the bankruptcy court erred in finding that the Order reflects

such an intent. (*See* Op. 29-30.) The face of the Agreed Order makes clear that it did *not* resolve

this issue, expressly stating that it is "without prejudice to . . . any and all [of Kmart's] defenses,

objections and counterclaims" to the Claims. (AD 58 at 3.) Rather than finally resolve the

question of whether the section 502(b)(6) cap applies to the Claims asserted by Claimants

(Claims that were not resolved by the Agreed Order), the Agreed Order simply leaves that

question—and other questions related to the disposition and validity of Claimants' outstanding

and then-unresolved proofs of claim—for another day.

    That decision *not* to resolve these issues in connection with the Agreed Order was only

sensible. There was at that time no occasion or reason to decide the issue of whether Claimants'

proofs of claim were the "claim[s] of a lessor for damages resulting from the termination of a

lease" under section 502(b)(6). The purpose of the Agreed Order, instead, was to resolve certain

---

[15]    *See also Levinson v. Unites States*, 969 F.2d 260, 264 (7th Cir. 1992) ("[t]here is an exception to this general rule where the parties to a . . . consent judgment intended to foreclose an issue from future litigation"); *La Preferida, Inc. v. Cerveceria Modelo*, 914 F.2d 900, 906 (7th Cir. 1990) ("issues underlying a consent judgment generally are neither actually litigated nor essential to the judgment."); *Shearer v. Dunkley (In re Dunkley)*, 221 B.R. 207, 213 (Bankr. N.D. Ill. 1998) (denying issue preclusive effect of an agreed order because, "although Defendant intended to be bound by the effect of [the] Agreed Judgment Order, he did not intend to admit the underlying alleged factual predicate, nor did [the court] make any such factual findings.").

outstanding claims that BNY brought against Kmart in BNY's role as Indenture Trustee in the

Leveraged Lease Transaction.  It thus cannot plausibly be maintained that Kmart "actually

litigated," or "resolved," the cap issue with respect to Claimants' Claims as part of an Agreed

Order that only resolved the separate claims of BNY.

Instead of relying on the context and purpose of the Order, and the clear and express

"without prejudice" language, the bankruptcy court instead seized on language stating that

Claimants' Claims "shall not include damages of the lessors resulting from termination or

rejection of the . . . Leases that are subject to the limit set forth in Section 502(b)(6), which

claims shall be exclusively held by . . . BNY."  (AD 58 at 3.)

The purpose of that language is straightforward.  Because BNY effectively foreclosed on

the properties and was entitled to receive any rent payments, this provision made clear that the

claim arising out of the transaction for unpaid rent—which claim is indisputably subject to the

Section 502(b)(6) cap—would be held by BNY, rather than Claimants.  The bankruptcy court

thus erred by construing that language to mean "that Kmart, BONY, and Claimants . . . agreed

that the claims 'exclusively held' by BONY were the only claims arising from the transaction

subject to the section 502(b)(6) cap and that the claims asserted by Claimants were distinct from

the BONY Claims, not to be capped under section 502(b)(6)."  (Op. at 30-31.)

The Agreed Order's careful use of the future and present tenses, when describing

Claimants' and BNY's claims, respectively, confirms this error.  That is, in contrast to the future-

looking language that Claimants' Claims "*shall not* include damages . . . subject to the limit set

forth in Section 502(b)(6)," the Agreed Order definitively states—in the present tense— that the

BNY claims "*do not* include any claims for     . . . expenses and for indemnification of . . . Owner

Participants [Claimants] . . . ." (AD 58 at 3-4 (emphasis added).)

24

In short, the Agreed Order "walled off" the unresolved claims of Claimants from the claims being granted to BNY, and visa-versa, in order to avoid litigation between BNY and Claimants over which party is entitled to which damages. Since the contours and amount of the BNY claims were defined under the Agreed Order itself, it was possible to determine and memorialize *at that time* that the claims being granted to BNY "do not include" claims for expenses or indemnification—indeed, BNY expressly "acknowledge[d]" that fact in the Order. On the other hand, the Agreed Order did not resolve whether Claimants' Claims, which were then unresolved, would be subject to the section 502(b)(6) cap. The use of the "without prejudice" language with respect to Claimants' Claims makes that crystal clear.

It is instructive to compare the facts of *Klingman v. Levinson*, 831 F.2d 1292 (7th Cir. 1987), a case on which the bankruptcy court relied, to those of *La Preferida, Inc. v. Cerveceria Modelo*, 914 F.2d 900 (7th Cir. 1990). In *Klingman*, Mr. Levinson had previously entered into a consent decree with Ms. Klingman in connection with state court litigation. *See* 831 F.2d at 1293-94. The state court consent decree stated, in no uncertain terms, that "the debt owed to Ms. Klingman [by Mr. Levinson] would 'not be dischargeable in any bankruptcy or similar proceeding and that in any subsequent proceeding all of the allegations of the Complaint and findings of this Court may be taken as true and correct without further proof.'" *Id.* at 1296 (quoting the consent decree agreement). Thus, the court there unsurprisingly found that the consent decree had issue preclusive effect regarding the non-dischargability of Ms. Klingman's debt in Mr. Levinson's subsequently filed bankruptcy.[16]

The facts of the *La Preferida* case, on the other hand, are more akin to the facts here. In that case, Cerveceria Corona, Inc. ("Corona") first entered into a distribution agreement with La

Preferida, and later entered into a separate distribution agreement with Cerveceria Modelo, S.A. ("Modelo"). 914 F.2d at 901. In Corona's subsequent bankruptcy, La Preferida filed a claim alleging that Corona breached the distribution agreement it had with La Preferida. *Id*. at 902-03. Corona objected to the claim, which ultimately was withdrawn with prejudice pursuant to a consent judgment stating that the claim "is disallowed on the merits [and] debtor's objection to the claim [the objection being that Corona properly terminated and did not breach the agreement] is sustained." *Id.* at 903.

La Preferida then filed a separate suit in district court against Modelo, claiming that Modelo tortiously induced Corona to breach its distribution agreement with La Preferida. *Id*. at 904. The district court gave preclusive effect to the prior order, holding that the consent judgment barred La Preferida from claiming against Modelo. The Seventh Circuit reversed. While "[t]he text [of the consent judgment] makes it very clear that . . . Corona is no longer . . . accountable for any breach[,] . . . *the text does not at all make it clear that, by abandoning its claim against Corona, La Preferida also was abandoning its claim against Modelo. . . .*" *Id.* at 907 (emphasis added). Thus, "the general rule forbidding the application of collateral estoppel to consent judgments, rather than the exception noted in *Klingman*, must control the disposition of this case." *Id.*

The same is true here. Just as in *La Preferida*, the BNY Agreed Order here should not be read to preclude Kmart from making objections to Claimants' Claims, when those Claims were not resolved by the BNY Agreed Order. Indeed, the "without prejudice" language in the BNY Agreed Order makes the argument against preclusion even stronger here than it was in *La Preferida*.

---

[16]     The *Klingman* court noted that it was "establsihe[d] that the [consent] judgment against Ms. Levinson resulted from misappropriation and defalcation," which fulfilled a key element of non-dischargability under 11

In sum, for issue preclusion to apply here, Kmart and Claimants would have had to

"*manifest an affirmative intention* to be bound by [a] stipulation [regarding the applicability of

the cap] in future cases" *Gen. Dynamics Corp. v. AT&T*, 650 F. Supp. 1274, 1283 (N.D. Ill.

1986) (quotations and citations omitted) (emphasis added). Here, just the opposite is true.

### B. The Claims Are "The Claim[s] Of A Lessor For Damages Resulting From The Termination Of A Lease Of Real Property."

While the lease arrangement here was documented so that Claimants were not nominal

parties to the Leases, bankruptcy law does not permit form to be so elevated over substance.

Rather, in the bankruptcy context courts routinely look through the labels parties attach to

transactions to the fundamental economic substance. *See Pepper v. Litton*, 308 U.S. 295, 304-05

(1939). Here, the economic substance of the transaction is unquestionably that Claimants were

the landlords. That much is clear from the tax treatment of the transaction, under which

Claimants were deemed to be the owners of the property, entitled to deduct the depreciation in

the property's value from their income. As such, there is no reason why a bankruptcy court,

which since the time of *Pepper* has unquestionably been charged with disregarding formalistic

labels to ascertain the economic substance of the parties' relationship, should not do the same.

Indeed, if the bankruptcy court's decision here were allowed to stand, it would serve as

an open invitation to counsel for landlords to structure every lease transaction with a subsidiary

or pass-through trust acting as the "lessor," and the tenant giving a guarantee of the trust's

obligation to upstream the rent to the true lessor. If the tenant's obligation under the guarantee

were deemed to fall outside the scope of section 502(b)(6), as the bankruptcy court here

concluded, then Congress' purpose will have been eviscerated by clever drafting. The point of

the *Pepper* doctrine is to preclude exactly that—allowing parties to paper a transaction to

---

U.S.C. § 523(a)(4). *Klingman*, 831 F.2d at 1295-96 (citing the consent judgment).

conduct an end run around Congress' statutory purposes. As in *Pepper* itself, the true economic

substance of the transaction, not the labels attached by the parties, should be controlling.

Nor is there serious dispute that the second prong of section 502(b)(6) is satisfied, since

the damages Claimants seek undoubtedly *result from* Kmart's lease rejections. The bankruptcy

court simply erred in relying on the fact that Claimants theoretically *could have* incurred tax

damages that would "not necessarily [be] triggered by termination of the [L]eases" (Op. at 35),

when the relevant question is whether the damages that Claimants sought *were in fact* a result of

the rejection of the Leases. In that regard, the fact that of the sixteen properties that were leased-

back to Kmart, damages were only sought for the ten properties that Kmart rejected, is highly

probative as to the "cause" of the damages claim. The bankruptcy court also erred by failing to

recognize that it is immaterial that Claimants do not seek lost rent under the rejected Leases, as

the cap is commonly applied to all lease-related damages, and is plainly not confined to lost rent.

Nor does it matter that the damages arise under the Tax Indemnification Agreement, which is

written on a separate piece of paper from the Leases—the economic reality remains that the

damages were caused by the rejections of the Leases.

    1.    <u>Claimants Were The True Lessors.</u>

In a leveraged lease transaction, the Owner Participant (such as Claimants) exerts control

over virtually all decisions regarding the property being leased, and bears the economic benefits

and burdens of owning the property. The pass-through Owner Trust (the nominal property

owner and lessor) merely acts as property manager, distributing the rent payments made by the

original owner (now the lessee) between the Owner Participant and the lending bank. Thus,

while the Leveraged Lease Transaction at issue here was surely more complex than a traditional

two-party lease, Claimants undoubtedly played the role of property owner and lessor as a matter of fundamental economic substance.

The bankruptcy court was correct to say that there is only a "modicum of case law" on the specific question presented (Op. at 32). But the basic and controlling principles—that form cannot prevail over substance and that a bankruptcy court should inquire into the true economic nature of the parties' relationship—are clear and well-established. *See Pepper v. Litton*, 308, U.S. at 304-05 (1939) (a bankruptcy court's equitable powers "have been invoked to the end that . . . substance will not give way to form, that technical considerations will not prevent substantial justice from being done"); *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) ("the court has never regarded the simple expedient of drawing up papers . . . as controlling for tax purposes when the objective economic realities are to the contrary") (internal quotations omitted); *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255 (1939) ("[i]n the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding").[17]

In light of that established principle, it is unsurprising, as the bankruptcy court itself stated, that "courts have reached the general consensus that a lessor's claim against the estate of a bankrupt *who is not the nominal lessee*, but guarantor of the lease of a non-bankrupt tenant, is subject to the cap." (Op. at 32 (citing *In re Lindsey*, No. 96-2268, 1997 WL 705435, *3 (4th Cir. Nov. 7, 1997)) (emphasis added)); *see also, e.g., In re Farley Inc.*, 146 B.R 739 (Bankr. N.D. Ill.

---

[17]     *See also Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 454-55 (3d Cir. 2006) (noting the courts' power to "recharacterize" purported debt to equity, and observing that such authority inheres in the courts' equitable authority to ensure "'that substance will not give way to form'") (quoting *Pepper v. Litton*); *In re Witte*, 841 F.2d 804, 808 (7th Cir. 1988) (where potential windfall made possible by distinction between "suit" and "judgment" for damages, courts should disregard formal distinction in favor of just and equitable result).

1992); *In re Interco. Inc.*, 137 B.R 1003 (Bankr. E.D. Mo. 1992); *In re Thompson*, 116 B.R. 610 (Bankr. S.D. Ohio 1990); *In re Rodman*, 60 B.R. 334 (Bankr. D. Okla. 1986).

In addition, there is at least one case, *In re Southern Cinemas*, 256 B.R. 520 (Bankr. M.D. Fla. 2000), that applies this principle in circumstances that, while not factually identical to the present case, involved closely analogous circumstances.  In *Southern Cinemas*, the landlord entered into a lease with a tenant.  The lease was then assigned by the tenant to an assignee.  The assignee's obligation to make the rental payments was guaranteed by a separate but related corporation.  When the assignee later dissolved its business, the lease was assigned again, this time to the corporation that had originally given the guarantee.  The corporation later filed for bankruptcy and ultimately rejected the lease it had been assigned.

Once the landlord was no longer receiving the rent payments that the rejecting debtor corporation had previously guaranteed, it demanded past due rent from the original tenant (it did not file a claim against the debtor corporation).  The original tenant, in turn, filed a claim against the debtor corporation for the rent that it then owed the landlord.  The original tenant, just like Claimants here, argued that the section 502(b)(6) cap had no application to its claim against the debtor corporation, since the original tenant was not the nominal "lessor" of the property.  The *Southern Cinemas* court, however, flatly rejected this reasoning as unpersuasive, holding that to allow circumvention of the statutory purpose of the Bankruptcy Code on account of mere labels would encourage parties to "invent relationships that fall outside the scope of the lessor-lessee contract and limit the reach of § 502(b)(6)."  *Id.* at 536.  This same reasoning applies fully— indeed, more so—here.

The bankruptcy court here distinguished *Southern Cinemas* on the ground that there the original tenant "stepped into the shoes of the lessor who initially held the lessor claims," whereas

here it was BNY (not Claimants) who "became entitled to the lessor claims previously held by the Owner Trusts." (Op. at 33). Accordingly, the bankruptcy court concluded the logic of *Southern Cinemas* did not support the application of the cap to Claimants' claims.

To be sure, the *manner* in which the original tenant came to occupy the position of landlord in *Southern Cinemas* is different from the manner in which Claimants here did so. But if anything, the case for treating Claimants as landlords is even stronger than it was in *Southern Cinemas*. In economic substance, the nature of the relationship is that Claimants are the owner and landlord with respect to the property, and BNY is the lender and mortgagee. And the pass-through trust was just that—a pass-through of no economic consequence. For example:

- Claimants reaped the benefits and bore the burdens of owning the leased properties;
- Claimants had control over virtually all decisions regarding the properties;
- Claimants made a 20% equity investment in the ten rejected properties, and BNY provided the remaining 80% of the purchase price by supplying the Mortgage Debt;
- Claimants were treated as the *owner and lessor* of the properties for tax purposes;
- Claimants were entitled to take depreciation deductions related to owning the properties;
- Claimants were treated as borrowers of the BNY non-recourse Mortgage Debt for tax purposes, and were entitled to take interest deductions related to the Mortgage Debt;
- Claimants received the "free cash" from the rent, in excess of the BNY debt obligation;
- Claimants counted the full amount of Kmart's rent payable -- the amounts paid toward the Mortgage Debt owed to BNY as well as the free cash -- as gross income for federal and state income tax purposes;
- Claimants leased the properties back to Kmart via pass-through Owner Trusts;
- Claimants were the beneficiaries of the Owner Trusts;
- Claimants set the rent and debt payment schedules; and
- Claimants had rights to the residual value of the properties once the Transaction had gone to term.

Thus, just as in *Southern Cinemas*, the Court here must "prevent manipulation of statutory language by looking to the nature of the relationship, rather than the words used, to determine the rights and responsibilities of the parties." 256 B.R. at 536. A party to a lease

31

transaction that in all economic respects is similarly situated to a traditional landlord, but is not the nominal lessor because of the way the transaction is papered, should not receive more favorable treatment in bankruptcy than any other landlord. If the mere contrivance of setting up a pass through trust to administer the rent payments is sufficient to avoid the application of the cap, every landlord will create such a subsidiary or trust entity to serve as the nominal landlord.

2.     Claimants' Damages Resulted From Kmart's Rejections Of The Leases.

The remaining question is simply whether the Claims "resulted from" Kmart's rejections of the Leases. They unquestionably did.

a.     *Kmart's Rejections Are The But For Cause Of Claimants' Damages.*

The bankruptcy court correctly identified the question here as being whether Claimants would have incurred their damages "*but for* the lease termination[s]." (Op. at 34 (quoting *In re Atlantic Container Corp*., 133 B.R. 980, 987 (Bankr. N.D. Ill. 1991)) (emphasis added)); *see also In re Farley, Inc.*, 146 B.R. 739, 746 (Bankr. N.D. Ill. 1992) (the section 502(b)(6) cap "limits . . . 'those damages which the lessor would have avoided but for the lease termination.'") (quoting *Atlantic Container*). The bankruptcy court's error was in its application of the "but-for" test.

Under traditional but-for analysis, "[t]he defendant's conduct is the cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." W. Page Keaton et al., *Prosser and Keaton on Torts* 266 (5th ed. 1985); *see also Barrett v. Int'l Armaments, Inc.*, No. 95 c 2690, 1997 WL 639226, at *5 (N.D. Ill. Oct. 6, 1997) ("[u]nder the 'but for' test, the defendant's conduct is a cause of an event if the event would not have occurred without it.").

Rather than engaging that analysis, the bankruptcy court focused on the fact that Claimants theoretically *could have* incurred tax damages that would "not necessarily [be]

triggered by termination of the [L]eases." (Op. at 35.) But the critical point here is that Claimants did not assert any tax loss with respect to the six properties that Kmart did not reject. That stark fact makes it unmistakable that the *actual* cause of the losses that Claimants assert was the rejection of the ten Leases in question. The damages would not have occurred but for, or without, those rejections.

Thus, while it is true that BNY was contractually entitled to foreclose on any of the sixteen properties once Kmart filed for bankruptcy protection, the deeds in lieu of foreclosure were *not* executed as to the six stores whose leases Kmart assumed or assigned in bankruptcy. Thus, the bankruptcy court simply erred in holding that "it is not evident that the Claims . . . are for damages resulting from the termination of the Rejected Leases." (Op. at 34.) The undeniable reality is that the deeds in lieu of foreclosure (which gave rise to the forgiveness of indebtedness income for Claimants) were caused by the rejections. Just as knocking over one domino sets off a chain reaction that causes the subsequent dominos to fall, there can be no question that knocking over the first domino—here, the lease rejections—*caused* the damages at issue.

> b. *The Scope Of The Statutory Cap Is Not Limited To Claims For Lost Rent Under A Lease.*

The second reason the bankruptcy court gave for not applying the cap was that the "claims do not *arise directly from* the leases." (*Id*. at 35 (emphasis added).) That conclusion was also erroneous, as section 502(b)(6) is commonly and noncontroversially applied to claims for damages beyond just those for lost rent under a lease. Indeed, the statute makes clear that it applies to damages that "*result from*" (not "arise directly from") the termination of a lease.

The five contested proofs of claim that were the subject of the trial below each candidly states that Claimants' requested damages *resulted from* Kmart's lease rejections. First is Claimants' proof of claim numbered 50863, which seeks damages resulting from six of the ten

33

rejected Leases. It asserts that the damages are for the "loss of assumed tax benefits *as a result of the rejection of the Rejected Lease[s]*." (AD 34 at 4, ¶ 10 (emphasis added).) The other four proofs of claim that were the subject of the bankruptcy court decision (claim numbers 50110, 50111, 50112, and 50113) each relate to one of the other four rejected Leases not covered by claim 50863, and these four nearly identical proofs of claim all assert, in their opening paragraphs, that they are for "damages arising from the rejection by Kmart Corporation of the Lease. . . .[,]" and go on to say that that "Kmart is obligated . . . to indemnify the Owner Participant for its [tax] loss . . . *as a result of the rejection of the Lease* . . . ." (AD 24-27 (emphasis added).)

Accordingly, the cap on damages squarely applies to the Claims pursuant to their own terms. The fact that Claimants' damages are for lost tax benefits and expenses incurred as a result of Kmart's rejections (and not for lost rent) does nothing to change this result, since the cap, by its own statutory terms, is not limited to claims for lost rent.

Three cases, all from the Bankruptcy Court for the Northern District of Illinois, are illustrative of this point. The first case is *In re Farley, Inc.*, 146 B.R. 739 (Bankr. N.D. Ill. 1992), in which the court found that the cap applied to "the residual guarantee clause, *i.e.* [the] $10,000,000 penalty imposed by the lease agreement in the event that [the] lessee fail[ed] to renew for another seven year term." *Id.* at 746. The *Farley* court applied the cap there since the damages "would have [been] avoided but for the lease termination." *Id.* (quoting *Atlantic Container*). Thus, the cap was not limited to lost rent damages, but also applied to the penalty, since the penalty "resulted from" the rejection of the lease.

The holding of *Farley* is consistent with the decision of *In re Goldblatt Bros., Inc.*, 66 B.R. 337 (Bankr. N.D. Ill. 1986), which also held that the cap applies to damages beyond lost

rent. The non-rent damages in *Goldblatt*—which were for construction and repair, attorney's fees, taxes, and other expenses incurred in an effort to relet the property—were in large part based upon an agreement between the parties that was separate from the rejected lease. *Id.* at 343-44. Nevertheless, while only $353,000 of the lessor's total damages of approximately $2.94 million were for lost rent, the court properly capped the full amount, including the damages arising under the separate agreement, since all of the damages resulted from the rejection of the lease. *Id.* at 345-46.

The third case is *In re Atlantic Container Corp.*, 133 B.R. 980 (Bankr. N.D. Ill. 1991), on which the bankruptcy court here relied in declining to apply the cap. (Op. at 34.) In *Atlantic*, the cap was not applied to damages that arose under certain repair and maintenance covenants, since such damages were incurred *before* the lease was terminated. *See Atlantic Container*, 133 B.R. at 986-87. Thus, the lease rejection at issue in *Atlantic* was not the but-for cause of the lessor's damages, because the lessor in *Atlantic* would not—indeed, could not—have avoided the damages "but for" the lease termination (as the damages had already been incurred). Just the opposite is the case here, however, as Claimants only incurred their requested damages *after*— in fact, *because of*— Kmart's rejections. Accordingly, a fair reading of *Atlantic* further supports the conclusion that the Claims at issue here should be subject to the ceiling set by Section 502(b)(6).

## II. THE BANKRUPTCY COURT CORRECTLY REDUCED CLAIMANTS' TAX DAMAGES CLAIM TO THE TAX HARM ACTUALLY SUFFERED.

If the Claims are not subject to the section 502(b)(6) cap, the bankruptcy court was correct to reduce Claimants' requested tax damages by the amount of Tax Savings[18] Claimants

---

[18]    The bankruptcy court appropriately referred to Kmart's proposed reductions to Claimants' tax claim as the "Tax Savings." (Op. at 40.)

received as a result of Kmart's rejections and the consequent deeds in lieu of foreclosure. Contrary to Claimants' arguments, the TIA only protects Claimants from tax-based harm; it does not serve as a guarantee for the income that Claimants anticipated receiving had the transaction gone to term. In this respect, the court properly considered and relied upon the expert testimony of Isaac Sperka in determining the amount of the Tax Savings Claimants received.

### A. The TIA Only Protects Claimants Against Unanticipated *Tax* Harm.

The critical language in the TIA is that Claimants' claim for tax damages shall be "a lump-sum amount which, on an After-Tax Basis, shall be sufficient to preserve the Owner Participant's Economics as if such Loss had not occurred." (Op. at 8 (quoting TIA[19] (AD 2-3) at 5-6) (emphasis added).) Whether that language is construed simply to provide a standard expectation damages remedy (putting the non-breaching party in the position it would have been had the beach not occurred) or, as the bankruptcy court concluded, as a "formulaic liquidated damages clause"—in which "the reduction of the Tax Savings is a component of the clause" (Op. at 38, 40)—is of little moment. The basic point is the same either way—Claimants are entitled to be made whole in terms of their tax position. They are not entitled to a windfall. Critically, the Tax Indemnity Agreement indemnifies Claimants only for their *tax* injury. Insofar as Claimants may have lost money because they did not receive the rental income they expected, the TIA provides no remedy for that problem. Pursuant to the terms of the Indenture, the Mortgage Debt was secured by the Leases; thus, after Kmart filed for bankruptcy BNY was able to exercise its right to capture the full amount of Kmart's rent payments (including the free cash). (JS at 28; AD 140, 11/9/05 Tr. at 106 (Mahoney).) As such, BNY rightfully held the claim (subject to the 502(b)(6) cap) for the lost rent. Accordingly, the principal theme of Claimants'

---

[19] The TIA can be found at AD 2-3 (there are two materially identical TIAs) and will be cited simply as the TIA hereinafter (without repeatedly referring to its designation). *See also supra* n.8.

brief—that they should be compensated for the lost rental income that they had intended to use to pay their tax bill—fundamentally misapprehends the basic economics of the Transaction.

The TIA makes clear that it is intended to provide only a make whole tax remedy. "The computation of [the indemnity] . . . shall take into account any past, current and anticipated interest, penalties and additions to tax payable by the Owner Participant . . . and any Federal, state or local net income *tax benefits* reasonably expected to be realized by the Owner Participant by reason of the circumstances or adjustments giving rise to" the indemnity obligation. (*Id.* at 8 (quoting TIA (AD 2-3) at 5-6) (emphasis added).)

As the bankruptcy court correctly noted, this construction of the TIA, as requiring a netting out of the tax benefits in order to determine the tax harm actually suffered, is supported by two leading treatises on the topic. (Op. at 42 n.20) As one of the treatises put it, "upon the occurrence of an indemnified event and the lessee's responsibility therefore, all of the tax consequences stemming from that event, *negative and positive*, are predicted and taken into account in deriving a lump-sum amount that will keep the owner participant whole on a present value basis." *See* Ian Shrank & Arnold G. Gough, Jr., *Equipment Leasing-Leveraged Leasing*, § 4:6-1, Page 4-220 (4th ed. 2003); *see also* Bruce E. Fritch, *Leveraged Leasing*, 347 PLI/Comm 408 at 440-41 (Practising Law Institute, Commercial Law and Practice Course Handbook Series, 1985) ("Of course, the indemnities should be off-set by any affirmative tax benefits the issue affords the lessor.").

The internal logic of the TIA points strongly in the same direction. As the bankruptcy court explained, the TIA provides two alternative methods for calculating the amount of a tax indemnity: clause (y) and clause (z) of section 3 of the TIA. (Op. at 7-8.) "Clause (y) is described as the 'pay-as-you-go' indemnity" while clause (z) requires a "lump sum" payment.

(Op at 8.)  Thus, as the bankruptcy court stated, "if . . . clause [(y)] applies, the indemnity amount would be paid by Kmart on an on-going basis, as opposed to as a lump sum."  (*Id*.)  In this context, it is noteworthy that the TIA:

> provides that '[i]f Kmart indemnifies the Owner Participant . . . and the Owner Participant shall realize . . . any . . . income tax savings . . . which tax savings were not taken into account in calculating Kmart's indemnity payment to Owner Participant, then *the Owner Participant shall pay to Kmart*, on an After-Tax Basis, *an amount equal to the sum of . . . such Federal income tax savings . . .*'  In other words, if Kmart pays the indemnity amount . . . through the course of the transaction under clause (y) [the "pay-as-you-go"], Claimants are required to reimburse the amount of tax savings they enjoyed during the time they received the indemnity payments.  *This idea of adjusting the indemnity amount with the tax savings is not lost simply because Kmart pays the indemnity as a lump-sum under clause (z) as opposed to over time under clause (y).*

(*Id.* at 41 (quoting the TIA at 9) (emphasis added).)

Claimants' calculations, and their brief on appeal, ignores all of this.  Instead, they fixate solely, and out of context, on the language of the TIA stating that the "lump-sum amount . . . shall be sufficient to preserve the Owner Participant's Economics," and that Owner Participant's Economics is defined in the Participation Agreement as the "Owner Participant's nominal after-tax yield, total *after-tax cash flow* and total FASB after-tax lease income for the first five years" of the Transaction.  (Ap. Br. at 13-14 (quoting TIA at 5; Participation Agreement (AD 1) at 44).)  From this, Claimants focus on the "after tax cash flow," effectively arguing that Kmart should be ordered to indemnify them for their loss of "free cash" under the TIA.  (*Id.* at 8-9, 19-28.)

This is precisely the approach that was considered and rejected by the court in *General Foods Credit Corp. v. United Airlines, Inc. (In Re UAL Corp.)*, No. 06 c 4243, 2007 WL 256323 (N.D. Ill. Jan. 22, 2007), which affirmed a bankruptcy court decision on which the bankruptcy court in this case relied.[20]  In that case, General Foods, as Owner Participant, sought the recovery

---

[20]    *See* Op. at 36, 42-43 (citing *In re UAL*, 346 B.R. 783 (Bankr. N.D. Ill. 2006)).

of free cash under a TIA it had entered with United Airlines. Just as Claimants have done here, General Foods seized on language in its TIA stating that United Airlines was required to "maintain" their "Net Economic Return." *Id*. at *4. "Net Economic Return" was defined in the United Airlines TIA as General Foods' "after-tax book yield, aggregate *after-tax cash flow* and no less than 100% of the book income for each year prior to the fifth anniversary of the Closing Date. . . ." *Id*. at *2 (emphasis added). It is thus unsurprising that the bankruptcy court here found that "Net Economic Return . . . is *synonymous with* 'Owner Participant's Economics'"— the two definitions are nearly identical. (Op. at 42 (emphasis added).)

Claimants nevertheless curiously accuse the bankruptcy court of "mak[ing] no attempt to even determine that the specific contractual language addressed by Judge Wedoff [in *UAL*] mirrored the instant provision [at issue here]. . . ." (Ap. Br. at 18.) But the *UAL* decision makes clear on its face that the bankruptcy court was correct in finding that "the reasoning [of *UAL*] easily fits the circumstances here." (Op. at 43.) Indeed, the bankruptcy court's decision follows logically from the holding in *UAL* that "General Foods interpretation of [the TIA] transforms the TIA's purpose from indemnifying General Foods for the loss of certain tax benefits to indemnifying General Foods for the loss of Net Economic Return. This is inconsistent with the parties' manifest intent in the TIA." *UAL*, 2007 WL 256323 at *4.

Claimants focus on their loss of the "free cash" they would have received had the Leases not been rejected is subject to the very same criticism. The TIA is a <u>Tax</u> Indemnity Agreement, not an indemnity for the free cash. Claimants have gone to great lengths to demonstrate that the free cash they would have received from Kmart, had the Transaction gone to term, would have covered their tax liability under the Transaction going forward. (Ap. Br. at 19-23.) But the loss of that rental income is just a function of the fact that the Mortgage Debt had been secured by the

Leases; thus, BNY held the right to the full amount of Kmart's rent payments (including the free cash) once Kmart filed for bankruptcy protection. (JS at 28; AD 140, 11/9/05 Tr. at 106 (Mahoney).) The *UAL* decision addressed precisely this issue. As the court there explained, Claimants "assigned all of the cash flows under the Lease[s] as security to the indenture trustee [here, BNY]. . . . If the TIA indemnity was construed as intending to provide [Claimants] with more than the net tax consequences, the TIA would erode the cash flows from the payments on the Lease securing" the mortgage that Claimants received from BNY. *UAL*, 2007 WL 256323 at *5. In short, if the TIA here was in fact intended to serve as a *de facto* indemnity for the free cash (which it surely was not), then both BNY and Claimants would have claims for that same free cash.[21]

In sum, Claimants' interpretation of the TIA is inconsistent with (i) the terms, purpose, and internal logic of the TIA; (ii) two leading treatises on the construction and interpretation of TIAs; (iii) the sensible and highly relevant holding of the *UAL* decision; and (iv) the structure and terms of the Leveraged Lease Transaction as a whole. The bankruptcy court's decision with respect to Claimants' tax damages is sound and should be affirmed.

### B. The Bankruptcy Court Properly Considered Kmart's Expert Testimony

Claimants' final argument is an attack on the bankruptcy court's evidentiary ruling regarding the admissibility of Kmart's expert witness testimony. Their argument in this regard confuses a party's discovery obligations to provide a report detailing the expert's opinions and all bases therefore, with the type of trial evidence that is properly considered by the ultimate finder of fact.

---

[21] In their discussion of the free cash issue, Claimants also charge that "Kmart's evidence was devoid of any showing as to what the likely values of the ten properties might be either currently or at the end point in the year 2020." (Ap. Br. at 22.) But this issue was the subject of a pretrial stipulation under which the parties agreed that the

It should be elementary that a party that seeks to present expert testimony at trial must first comply with the pretrial discovery requirements set forth in Federal Rule of Civil Procedure 26(a)(2)(B), which states in relevant part:

> with respect to a witness who is retained or specially employed to provide expert testimony in the case . . . [ the party must submit] a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Here, Kmart and Claimants both timely served expert reports for their respective expert witnesses, fulfilling the expert disclosure requirements of Rule 26. In addition, each of the parties deposed the other's expert, and asked extensive questions regarding the other's expert report.

The admissibility of expert testimony at trial, however, is governed by Federal Rule of Evidence 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In applying Rule 702, the trial judge acts as a "gatekeeper" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 597 (1993)). The gatekeeping function is "to make certain

---

fair market value of the ten properties, at the time they were rejected, was less than the amount of the unpaid principal and accrued but unpaid interest of the outstanding Mortgage Debt for the ten properties. (JS at 29.)

that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Claimants have essentially alleged that the bankruptcy court failed to perform its gatekeeping function. (Ap. Br. 30-32.) They point to the unimportant fact that Mr. Sperka's expert report was not admitted into evidence, and from that fact they argue that "there is simply no basis to rely upon" Mr. Sperka's adjustments for the "accrued but unpaid interest" and "unamortized fees."[22] (Id. at 31.)

First of all, there is absolutely no requirement that a testifying expert's pretrial expert report—which is of course an out-of-court statement made by a testifying witness, and therefore hearsay—be offered and admitted into evidence at trial in order for the expert's testimony to meet the standards of Rule 702.[23] The relevant point is that Mr. Sperka's testimony was based upon sufficient facts, was the product of reliable principles and methods, and that Mr. Sperka applied those principles and methods reliably to the facts of the case. *See* Fed. R. Evid. 702. In this regard, the bankruptcy court took the time to explain how it fulfilled its gatekeeping function, finding that Mr. Sperka

> did not just give a naked opinion of what he thought was the amount of the Tax Savings. In arriving at his opinion, Sperka and his colleague consulted Claimants' ABC Pricing Files,[24] which were admitted into evidence. The ABC

---

[22]    Claimants apparently do not question Mr. Sperka's calculation for the "present value" adjustment. Their sole argument in that regard is that the TIA does not take into account such Tax Savings.

[23]    *See, e.g., Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 96 CIV 7874 (RWS), 2002 WL 826956 at *7 (S.D.N.Y. May 1, 2002) ("Even if the body of an expert's report is not admitted into evidence, it is within the trial judge's discretion to permit the use of charts by the expert to explain his expert opinion so long as those charts are accurate and not unduly prejudicial."); *Lucent Technologies, Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 205 n.5 (D. Del. 2001) (The fact that an expert report was not admitted into evidence played absolutely no role in the court's determination of the weight of the expert's testimony.).

[24]    Claimants have described the ABC pricing files as "a series of reports generated from a complex computer program designed to identify expected returns and related financial information." (Ap. Br. At 19-20.) The ABC pricing files can be found at AD 112.

Pricing Files contained information such as the depreciation applied to the properties, the interest rates on the Indentures, the amount of third-party debt involved, and the equity and fees invested by Claimants. Sperka also reviewed the tax returns and the damage model prepared by Claimants, which are also in evidence. Finally, he testified concerning the inferential processes he used in reaching his conclusion.

(Op. at 43-44 (citations to trial transcript omitted).) As such, the bankruptcy court correctly found Mr. Sperka's testimony met the applicable standards.

By way of further illustration, in terms of the two specific topics of Mr. Sperka's testimony about which Claimants now complain—the "unamortized fees" and "accrued but unpaid interest" adjustments—the following is just one passage from Mr. Sperka's trial testimony on those two issues:

**Kmart's Counsel**: Okay. I want to turn to the next adjustment, fees and amortization.
**Mr. Sperka**: Okay.
**Kmart's Counsel**: In connection with this transaction, were there fees incurred?
**Mr. Sperka**: There were at the onset of the transaction. One of the tax assumptions was that those fees should be deductible ratably over the course of the term of the [L]ease.
**Kmart's Counsel**: Okay. And what actually happened?
**Mr. Sperka**: As of the time that the transaction was terminated, the fees became immediately deductible.
**Kmart's Counsel**: Is that a tax benefit?
**Mr. Sperka**: That is. That is a deduction today rather than deductions over the course of 18 years.
**Kmart's Counsel**: And did PMCC adjust its damage model so that it didn't seek to recover that benefit essentially twice?
**Mr. Sperka**: It did not.
**Kmart's Counsel**: Did you perform a calculation that would take out from the $21 million claim an amount so that they didn't do that?
**Mr. Sperka**: We did.
**Kmart's Counsel**: What is that amount?
**Mr. Sperka**: . . . $387,323.29.[25]

---

[25] Claimants argue that Mr. Sperka's calculation of the unamortized fee adjustment was flawed because he did not apply a "present value analysis" to that adjustment. (Ap. Br. at 30.) Here, Claimants omit that during cross-examination Mr. Sperka explained at length why he did not "present value" that adjustment. (AD 143, 12/1/05 Tr. at 38-42 (Sperka); 38:33-39 (**Mr Sperka**: "To present value the deduction of the fees? You wouldn't do that because they were deductible today. The full value was deductible today. There's nothing to PV [present value].").) While Mr. Sperka explained on cross-examination why the unamortized fees should not be "present valued," Claimants nevertheless now argue that the adjustment for unamortized fees should be reversed because "no evidence [of the present value of the fees]. . . was ever put forth by Kmart." (Ap. Br. at 30.) This ignores Mr. Sperka's

43

**Kmart's Counsel**:  Okay.  I would like to ask you next about accrued by unpaid interest.

**Mr. Sperka**:  Okay.

**Kmart's Counsel**:  That's the third category of adjustment.

**Mr. Sperka**:  Yes.

**Kmart's Counsel**:  We talked earlier about this visual [a trial demonstrative] and the payment flow of rents and the tax consequences.

**Mr. Sperka**:  Yes.

**Kmart's Counsel**:  Am I right that you said that . . . the hundred dollars [an arbitrary number used for the purpose of the demonstrative] here on this chart when it comes in the form of rent is taxable?

**Mr. Sperka**:  That's correct.

**Kmart's Counsel**:  And where does that rent go?

**Mr. Sperka**:  That goes to the owner participant, who divides the rent amongst the participant – amongst PMCC and the indenture trustee.  $80 of it, which we are focusing on right now, goes to pay interest [the other $20 is the free cash].

**Kmart's Counsel**:  Okay.  And that $80 that goes to pay interest, what's the tax consequences of that $80?

**Mr. Sperka**:  That – that debt – interest is deductible to PMCC.

**Kmart's Counsel**:  Okay.  So if this transaction had gone on as anticipated from 1995 until 2020, there would be some variant of this that took place periodically?

**Mr. Sperka**:  That's right.

**Kmart's Counsel**:  And what would – each time what would the tax consequence be?

**Mr. Sperka**:  Well, each time – let's just isolate the portion of the rent which is going to – which is devoted to the interest.  You would have that rent of the $80 coming in.  And that would be taxable income to the owner participant.  And then you would have $80 going out to the Bank of New York.  And that would be – that would be deductible as interest.  So you would have the two offset would be a wash.

**Kmart's Counsel**:  Okay.  Now let's talk about what actually happened here.  And let's start with as of the rejections of the underlying [L]eases.  Once the leases were rejected, did Kmart continue to make rent payments?

**Mr. Sperka**:  After the rejections they stopped.[26]

**Kmart's Counsel**:  Okay.  So the hundred dollars stopped coming in?

**Mr. Sperka**:  Correct.

**Kmart's Counsel**:  Did PMCC then record as income these hundred dollar payments that would have happened had the transaction gone on as expected?

**Mr. Sperka**:  We heard in the first part of the trial it would – they did not.

**Kmart's Counsel**:  Because they didn't actually get the money?

**Mr. Sperka**:  Right.

**Kmart's Counsel**:  Okay.  Did they actually then pay the interest to the Bank of New York?

---

commonsensical testimony, and the fact that Claimants themselves "offered no alternative amounts for the Tax Savings" at trial (even while they presented rebuttal testimony after Mr. Sperka testified).  (Op. at 44.)

[26]    At trial Claimants explained that the rent payments were captured by BNY immediately after Kmart filed for bankruptcy protection (before Kmart actually rejected the underlying Leases).  (AD 140, 11/9/05 Tr. at 106 (Mahoney).)

**Mr. Sperka**: No.

**Kmart's Counsel**: Okay. So the interest wasn't actually paid?

**Mr. Sperka**: Correct.

**Kmart's Counsel**: But did they take a deduction for the interest that they were obligated to pay but didn't actually pay?

**Mr. Sperka**: That we heard at the first part of the trial that that's the case. They deducted the interest. Hence, accrued but unpaid interest.

**Kmart's Counsel**: What was the consequence of that for PMCC's tax bill?

**Mr. Sperka**: Well, it was a benefit because they have a deduction with no associated income, income that they anticipated having if the transaction had gone as normal.

**Kmart's Counsel**: Did that lower their tax bill?

**Mr. Sperka**: Correct. It would lower their tax bill.

**Kmart's Counsel**: Now, what happened when the deed in lieu occurred?

**Mr. Sperka**: When the deed in lieu occurred, there was an income inclusion. And the income inclusion included as part of it the accrued but unpaid interest that became taxable then.

**Kmart's Counsel**: And is the PMCC seeking to recover from Kmart the obligation to pay those taxes that had the transaction gone as expected they would have been obligated to pay?

**Mr. Sperka**: That's correct. They are seeking an indemnity for the inclusion for the accrued but unpaid interest, even though all that inclusion does is put them exactly where they would have been had the transaction been going normally and they hadn't received the rent.

**Kmart's Counsel**: Okay. Just so I understand, have you done a calculation in which you sought to figure out how much their $21 million claim should be reduced by if Kmart is obligated to indemnify PMCC for these amounts which were taxes that they were going to be required to pay all along?

**Mr. Sperka**: We did. . . [I]t's $7,307,865.26.

(AD 142, 11/30/05 Tr. at 115-120 (Sperka).)

In addition, Claimants' *own witness* "expressed *no problems* with Kmart's calculation of the Tax Savings" at trial. (Op. at 44 (citations to trial transcripts omitted) (emphasis added).) Just as Claimants cross-examined Mr. Sperka at trial, Kmart cross-examined Claimants' witnesses, including their "in-house tax counsel,"[27] Richard Mahoney. Kmart asked Mr. Mahoney whether he agreed with the Mr. Sperka's mathematical calculations regarding the "accrued but unpaid interest and "unamortized fees" adjustments. While Mr. Mahoney

---

[27]    *See* Ap. Br. at 6.

45

unsurprisingly disagreed with the conclusion that the claims should be adjusted, he endorsed Mr.

Sperka's underlying calculations:

- Regarding the *unamortized fees*:

    **Kmart's Counsel**:  Mr. Sperka has done some math to calculate that effect [of the unamortized fees], right?
    **Mr. Mahoney**:  Yes, I believe he has.
    **Kmart's Counsel**:  And he determined that the amount is $387,323, right? . . . . Now, did you check that number?
    **Mr. Mahoney**:  I did check the number.  I disagree with the adjustment, but I did check the number.
    **Kmart's Counsel**:  Okay.  When you say you disagree with the adjustment, you're talking about the correctness as a matter of contractual construction of making the adjustment, right?  You don't think that such an adjustment is appropriate?
    **Mr. Mahoney**:  That's exactly right.
    **Kmart's Counsel**:  But in terms of whether the number is right, it's right, isn't it?
    **Mr. Mahoney**:  Yes.  I wasn't able to verify it dollar for dollar, but it was close enough for me.

    (AD 140, 11/9/05 Tr. at 101-02 (Mahoney).)

- Regarding the *accrued but unpaid interest*:

    **Kmart's Counsel**:  You're aware, though, that in Mr. Sperka's model, he did deduct out an amount associated with that accrued but unpaid interest?
    **Mr. Mahoney**:  Yes.
    **Kmart's Counsel**:  . . . [T]hat amount is $7,307,865; do you see that?
    **Mr. Mahoney**:  Yes.
    **Kmart's Counsel**:  Have you done any math to check that?
    **Mr. Mahoney**:  I was able to check his math.
    **Kmart's Counsel**:  Okay.  The math was right?
    **Mr. Mahoney**:  I agree with the math.  I disagree with the adjustment.

    (Id. at 124.)

Claimants nevertheless argue that the record does not support the bankruptcy court's

conclusion that the claims were correctly calculated.  (Ap. Br. at 2, 30-32.)  The opposite is true.

Claimants confirmed—on the record at trial—the correctness of Kmart's calculations.  The

bankruptcy court's conclusions in this regard should thus be affirmed.

46

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the bankruptcy court regarding the application of the section 502(b)(6) cap should be REVERSED, and the Claims DISALLOWED. In the alternative, the bankruptcy court's judgment regarding the proper calculation of the Claims should be AFFIRMED.

Respectfully submitted,

Craig Goldblatt
Michael Snyder
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
Telephone: (202) 663-6000

Andrew Goldman
WILMER CUTLER PICKERING HALE &
    DORR LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 230-8800

BARACK FERRAZZANO KIRSCHBAUM
  & NAGELBERG LLP

By: /s/ William J. Barrett
William J. Barrett (6206424)
200 West Madison Street
Suite 3900
Chicago, IL 60606
Telephone: (312) 629-5170
Facsimile: (312) 984-3150

Dated: June 4, 2007

US1DOCS 6221553v3