## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PHILIP MORRIS CAPITAL CORPORATION )
and HNB INVESTMENT CORP.,         )
                                  )
          Appellants/             )
          Cross-Appellees,        )
                                  )
          v.                      )    No. 07 C 1926
                                  )
KMART CORPORATION, et al.,        )
                                  )
          Appellees/              )
          Cross-Appellants.       )


### MEMORANDUM OPINION

This case is before us on appeal from Bankruptcy Judge Sonderby's Findings of Fact and Conclusions of Law and related orders of February 14, 2007, which resolved certain claims in the bankruptcy reorganization of Kmart Corporation ("Kmart") relating to a leveraged lease transaction involving sixteen Kmart stores. For the reasons explained below, the orders of the bankruptcy court are affirmed.

### BACKGROUND

In May 1995, Kmart entered into a complex form of a structured-finance transaction referred to as a leveraged lease with Philip Morris Capital Corporation and its wholly-owned subsidiary, HNB Investment Corp. (to whom we will refer collectively as "Philip Morris") and various other entities. In

general terms, such a transaction involves a series of agreements among several parties through which one party finances property by engaging in a sale and leaseback of the property with an investor whose primary motivation is to obtain the tax benefits associated with the property.  In this case, Kmart sold sixteen of its retail properties to a series of "Owner Trusts" for $170 million.  Kmart then entered into lease agreements with each of the sixteen Owner Trusts and continued, as lessee, to operate those retail stores. The overarching agreement in the transaction was referred to as the "Participation Agreement," and other agreements included the "Purchase Agreement," the "Tax Indemnification Agreement," and the "Leases."

Before entering into the transaction, Philip Morris ran a sophisticated and complex computer program designed to identify the expected return on its investment.  The program generated reports, referred to as the "ABC Pricing Files," upon which the pricing of the properties was based.  After considering the reports, Philip Morris, acting as an "Owner Participant," made a $22 million equity investment in the Owner Trusts in partial payment for the properties; the balance of the $170 million purchase price was financed through a public bond offering for which the Bank of New York ("BONY") served as an indenture trustee.  The bond offering was secured by mortgages against the sixteen properties in addition

to assignments of the sixteen store leases, but was otherwise non-recourse.

Kmart paid rent on the properties to the Owner Trusts. The Owner Trusts, in turn, made payments on the debt service to BONY and for certain other fees. After those payments were made, the remaining "free cash" was transferred by the Owner Trusts to Philip Morris. For income tax purposes, the Owner Trusts were treated as pass-through entities; therefore, Philip Morris could claim tax deductions for periodic depreciation on the properties and for interest on the bond indenture obligations. At the same time, Philip Morris was required to report the full amount of the rental payments from Kmart as its taxable income.

About seven years after the parties entered into the leveraged lease transaction, on January 22, 2002, Kmart and numerous affiliates filed voluntary petitions for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. Because the bankruptcy filings constituted an event of default under the bond indentures, all principal and unaccrued interest amounts were accelerated and became due. BONY, as indenture trustee, exercised its right to to recover the rents due under the leases, including noticing foreclosures on some of the properties.

Within the bankruptcy proceedings, Kmart elected to assume six of the leases upon the subject properties and to reject the remaining ten leases. The Owner Trusts eventually executed deeds-

in-lieu of foreclosure in favor of BONY in satisfaction of the underlying non-recourse mortgage debt against those ten properties. The deeds-in-lieu caused Philip Morris to realize debt forgiveness income and to become liable for the tax on that income.

Philip Morris's realization of income and its consequent tax liability as a result of the deeds-in-lieu of foreclosure is at the heart of this appeal due to a Tax Indemnification Agreement ("TIA") that the parties entered into as part of the leveraged lease transaction. Essentially, the TIA required Kmart to indemnify Philip Morris for lost tax benefits in the event that the transaction ended prematurely. The TIA provides, in pertinent part:

> **Section 3. <u>Indemnified Losses.</u>** (a) Consistent with subsection (b), (i) if as a result of: . . . (VII) any pursuit of remedies (whether by the Owner Participant or Indenture Trustee or otherwise) following an Event of Default . . . the Owner Participant . . . (B) shall be required to include in gross income for Federal, state or local income tax purposes any amount not described in any of clauses (i) through (vi) of paragraph (i) of Schedule B hereto (an "Income Inclusion"): (any of the foregoing events in clauses (A) or (B) above so resulting being referred to hereinafter as a "Loss"), Kmart will pay to the Owner Participant an indemnity, determined pursuant to either clause (y) or (z) below.

(R. 2 at 3-4.) The parties agreed that the amount of the tax indemnity was to be determined using clause (z), which is discussed <u>infra</u>.

In April 2003, the bankruptcy court began its hearing on the confirmation of Kmart's Plan of reorganization. About 165

objections to confirmation of the Plan were filed, many by Kmart's landlords.  BONY filed such an objection, raising several issues.  On April 22, 2003, Kmart, BONY, and other lessors entered into a stipulation "resolving certain lessor objections to confirmation and establishing agreed claims resolution procedures."  BONY agreed to withdraw its objection to confirmation of the Plan, and Kmart agreed to an expedited claims resolution procedure.  On April 23, 2003, the bankruptcy court entered an order confirming the Plan.

Approximately one month later, Kmart objected to BONY's claims.  After an evidentiary hearing date was set, BONY and Kmart resolved their disputes and submitted a proposed order to the bankruptcy court.  The court entered the BONY Order, and Kmart was directed to serve copies of the order on counsel for Philip Morris, which then had ten days to file any objections.  Philip Morris received the BONY Order and asked Kmart and BONY for a clarification.  Kmart, BONY, and Philip Morris agreed to amend the BONY Order to accommodate this request for clarification.  On November 3, 2003, the bankruptcy court entered an amended agreed order resolving BONY's claims.

Between July 31, 2002 and June 5, 2003, Philip Morris filed the claims involved in this appeal, which totaled $30,374,127.  The claims were allocated as follows:  $21,080,373 under the TIA and the remainder under the general indemnity of the Participation Agreement.  Only the claims asserted under the TIA are at issue on

appeal. Kmart objected to Philip Morris's claims, and the bankruptcy court held an evidentiary hearing that lasted several days. Kmart argued that the claims were precluded entirely by the Agreed Order or alternatively subject to the cap on damages set out in § 502(b)(6) of the Bankruptcy Code. Putting aside these arguments, Kmart acknowledged that Philip Morris was entitled to its claims under the TIA, but contended that three categories of deductions to the claims were appropriate based on "tax savings" that Philip Morris would enjoy due to the early termination of the transaction. Philip Morris, on the other hand, argued that the Agreed Order precluded Kmart from raising the the § 502(b)(6) issue; that Kmart was estopped from raising the issue; that the cap did not apply in any event; and that the full amount of its claims should be awarded because Kmart's proposed deductions were not allowed under the TIA and because the calculations of Kmart's expert witness had no evidentiary value.

In a detailed written opinion titled "Findings of Fact and Conclusions of Law," In re Kmart Corp., 362 B.R. 361 (Bankr. N.D. Ill. 2007) (Docket No. 30688), Bankruptcy Judge Sonderby held that neither party had proved its claim preclusion argument, but that the doctrine of issue preclusion prevented Kmart from arguing that the § 502(b)(6) cap applied to the claims. The bankruptcy court further held that even if Kmart was not precluded from raising the issue, the cap would not apply to the claims. As for determining

the amount of the claims, the bankruptcy court found that Philip Morris's tax indemnity claims had to be reduced by $16,771,747 for "Tax Savings" and thus that the allowable portion of the claims based on the Tax Indemnity Agreement was $4,308,626 ($21,080,373 – $16,771,747).

On February 14, 2007, Bankruptcy Judge Sonderby entered an "Order Allowing Claim No. 50863 and Disallowing Claim Nos. 50110, 50111, 50112 and 50113." The order provides in pertinent part:

> IT IS HEREBY ORDERED for the reasons stated in this court's Findings of Fact and Conclusions of Law entered on this date, the amount of claim number 50863 is determined to be $4,737,624 and the same is allowed in that amount as an unsecured nonpriority claim, which is entitled to treatment under Class 5 of the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors-in-Possession.
> IT IS FURTHER ORDERED that claim numbers 50110, 50111, 50112, and 50113 are disallowed.

(Docket No. 30689).)[1] The same day, Judge Sonderby also issued orders denying Philip Morris's motion in limine to exclude evidence or argument regarding tax savings deductions (Docket No. 30687) and denying Philip Morris's motion for judgment pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52(c)(Docket No. 30685).

---

[1] The figure of $4,737,624 reflected the $4,308,626 portion of the claims under the Tax Indemnity Agreement plus the $428,998 portion of the claims under the Participation Agreement.

Philip Morris now appeals from Judge Sonderby's orders[2] and Findings of Fact and Conclusions of Law (Docket No. 30688), and Kmart has filed a cross-appeal from the above-quoted order (Docket No. 30689) and the Findings of Fact and Conclusions of Law. Philip Morris has requested oral argument. The request is denied because after reviewing the briefs, which are very thorough, we do not believe that oral argument will materially add to our understanding of the issues.

## DISCUSSION

This court sits as an appellate court for bankruptcy court proceedings. We review the bankruptcy court's factual findings for clear error and its conclusions of law de novo. See In re Smith, 286 F.3d 461, 464-65 (7th Cir. 2002); Fed. R. Bankr. P. 8013. Mixed questions of law and fact are reviewed de novo. Samson v. Alton Banking & Trust Co. (In re Ebbler Furniture & Appliances, Inc.), 804 F.2d 87, 89 (7th Cir. 1986). Furthermore, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013.

---

[2] In addition to the orders described supra, Philip Morris's notice of appeal also includes the bankruptcy court's order granting Kmart's motion in limine to exclude evidence relating to Kmart's settlement with Verizon (Docket No. 29352). Kmart argued in its motion in limine that Philip Morris should be precluded from using an agreement Kmart entered into to resolve Verizon's claims for the purposes of establishing Kmart's liability on Philip Morris's claims. In Kmart's view, Verizon's claims were completely separate from Philip Morris's claims. The bankruptcy court granted the motion. As far as we can tell, the issues presented for review by Philip Morris in its briefs do not appear to have any relation to the substance of this order, Docket No. 29352. In addition, Philip Morris fails to develop, and therefore waives, any argument as to the order. See Hojnacki v. Klein-Acosta, 285 F.3d 544, 549 (7th Cir. 2002) (a party waives any argument that it fails to develop on appeal).

Philip Morris raises the following issues for review:

(1) Does the plain language of the TIA permit the $16.7 million deduction from Philip Morris's claims for "tax savings"?

(2) Was the $16.7 million deduction properly calculated?
    (a) Was the deduction for interest expenses proper?
    (b) Was the deduction for unamortized transaction expenses proper?

(3) Did the bankruptcy court err by crediting the testimony of Kmart's expert witness, who calculated the deductions?

Kmart's cross-appeal raises the following issues for review:

(1) Did the bankruptcy court err in determining that the Agreed Order precluded Kmart from arguing that Philip Morris's claims were subject to the § 502(b)(6) cap on damages?

(2) Did the bankruptcy court err in holding that in any event the § 502(b)(6) cap did not apply to the claims?

Although Kmart is the cross-appellant, it will be useful to address its arguments first (the same order in which the bankruptcy court addressed these issues).

## A.   **Preclusion and the § 502(b)(6) Cap**

Kmart first contends that the bankruptcy court erred in determining that Kmart was precluded from arguing that the § 502(b)(6) cap applies to Philip Morris's claims. We find it unnecessary to reach this issue because even assuming arguendo that Kmart should not have been so precluded, we agree with the bankruptcy court that the § 502(b)(6) cap does not apply here.

Section 502, which puts a ceiling on a landlord's claim for damages arising from the termination of a lease, states in relevant part:

### § 502.  Allowance of claims or interests

(a)  A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects.

(b)  Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--
. . .
     (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--
          (A)  the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--
               (i)  the date of the filing of the petition; and
               (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
          (B)  any unpaid rent due under such lease; without acceleration, on the earlier of such dates . . . .

11 U.S.C. § 502 (emphasis added).  Thus, the claim has to be that of a lessor for damages resulting from a lease termination.  The purpose of the cap is to allow non-lessor creditors to recover more than they would otherwise receive if the lessor's claim were to be allowed in full, since a lessor's claim can likely be so large as to thwart reorganization efforts, while at the same time allowing

a lessor to obtain a reasonable portion of the damages it suffers.
In re Goldblatt Bros., Inc., 66 B.R. 337, 346 (Bankr. N.D. Ill.
1986).

It is undisputed that Philip Morris, as an Owner Participant,
was not the owner of the properties, nor was it Kmart's lessor; the
Owner Trusts were.  Yet Kmart urges us, as it did the bankruptcy
court, to recognize Philip Morris as the "true lessor" because the
Owner Trusts were pass-through entities for federal tax purposes
that "merely act[ed] as property manager."  (Kmart's Resp./Cross-
Appeal Br. at 28.)  Kmart concedes that the "bankruptcy court was
correct to say that there is only a 'modicum of case law'" on the
issue, id. at 29, but contends that we should regard Philip Morris
as the lessor because "in the bankruptcy context courts routinely
look through the labels parties attach to transactions to the
fundamental economic substance," id. at 27.  Kmart relies primarily
on the case of In re Southern Cinemas, Inc., 256 B.R. 520 (Bankr.
M.D. Fla. 2000), in which the bankruptcy court applied the §
502(b)(6) cap to a claim of a lease assignor for damages resulting
from termination of a lease.  Even though the assignor was not the
lessor, the court considered the distinction to be "meaningless"
because the nature of the relationship was such that the assignor
of the lease acted as a landlord.  256 B.R. at 536.  In Kmart's
view, this court should likewise disregard the Owner Trusts' role

as lessor as a "mere contrivance . . . to administer the rent payments." (Kmart's Resp./Cross-Appeal Br. at 32.)

In response, Philip Morris maintains that the facts of the instant case are distinguishable from those of <u>Southern Cinemas</u> and that we should not ignore the separate legal existence of the Owner Trusts, which were properly formed and maintained. According to Philip Morris, Kmart itself sought out, and benefited from, the carefully-planned structured finance transaction at issue here, and there is no reason to rewrite history solely so Kmart can avoid liability for the claims.

Philip Morris's arguments are well taken. We agree with the bankruptcy court that <u>Southern Cinemas</u> is distinguishable because there, the assignor stepped into the shoes of the lessor, who initially held the claims. Here, BONY--not Kmart--became entitled to the lessor claims that were previously held by the Owner Trusts. The claims of Philip Morris, as beneficiary of the Owner Trusts, arose under the TIA and not under the rejected leases as did the BONY claims. We also agree with the bankruptcy court's observation that in order to declare Philip Morris the "true lessor," we would either have to ignore the distinction between the Owner Trusts and Philip Morris as in a veil-piercing situation, or we would have to "recharacterize the entire transaction from an economic substance argument." <u>Kmart</u>, 362 B.R. at 386. The bankruptcy court stated that it was not inclined to do either; nor are we, especially

considering that there is no apposite precedent for ignoring the precise manner in which the parties structured their transaction. We are not persuaded by Kmart's dismissal of the trust structure as a "mere contrivance."

We also agree with the bankruptcy court that even were we to view Philip Morris as the "true lessor," it cannot be said that its claims are "for damages resulting from the termination of a lease" as is required to apply the § 502(b)(6) cap. As the bankruptcy court explained:

> The tax indemnity portion of the Claims is related to the Leases in the sense that the Leases are one component in a transaction designed to provide tax deferrals. However, the Claims here do not arise directly from the Leases. Instead, the Claims are based on Claimants' desire to recover lost tax benefits from the transaction should an adverse tax consequence take place, which is not necessarily triggered by termination of the leases.

362 B.R. at 386. The TIA, under which Philip Morris's claims arise, provides that Kmart must indemnify Philip Morris for Income Inclusions experienced "as a result of . . . any pursuit of remedies . . . following an Event of Default." (R. 2 at 3-4.) The Event of Default, as defined by the Leases, was Kmart's bankruptcy filing. The "pursuit of remedies" that caused the Income Inclusion was BONY's pursuit of remedies for the defaults under the indentures, and, as was demonstrated at the hearing, the deed-in-lieu transaction that occurred in satisfaction of the indebtedness to BONY. Therefore, we agree with the bankruptcy court that Philip Morris's claims were not for damages resulting from the rejection

of the leases, but from BONY's pursuit of remedies and the ensuing deeds-in-lieu of foreclosure.

We hold that the prerequisites for applying the § 502(b)(6) cap are not satisfied here. We now move on to the issues raised by Philip Morris in its appeal.

**B.  The "Tax Savings" Deductions from Philip Morris's Claims**

The bankruptcy court determined that Philip Morris's tax indemnity claims were subject to a $16,771,747 offset. Philip Morris asks us to assign error to this determination. It relies on the language of the TIA, which the parties agree is unambiguous.

The TIA requires Kmart to indemnify Philip Morris in the event that Philip Morris experienced certain Income Inclusions, also known as "Losses," and that the indemnity is to be calculated "pursuant to either clause (y) or (z)" of § 3 of the TIA. (R. 2 at 3-4.) The parties agreed, and the bankruptcy court accepted, that only clause (z) is applicable here.[3] Clause (z) provides in relevant part as follows:

> . . . Kmart shall pay to the Owner Participant as an indemnity a lump-sum amount which, on an After-Tax Basis, shall be sufficient to preserve the Owner Participant's Economics as if such Loss had not occurred. The computation of such lump-sum amount shall be made by the Owner Participant utilizing the methodology and assumptions, including the Tax Assumptions, utilized by the Owner Participant in determining Basic Rent and Termination Value, except as such assumptions shall be varied to take into account such Loss and any prior Loss.

---

[3]/ Clause (y) is a "pay-as-you-go" indemnity provision applicable only "so long as no . . . Event of Default has occurred." (R. 2 at 4.)

. . . The computation of such lump-sum amount under this clause (z) also shall take into account any past, current and anticipated interest, penalties and additions to tax payable by the Owner Participant as a result of such Loss and any Federal, state or local net income tax benefits reasonably expected to be realized by the Owner Participant by reason of the circumstances or adjustments giving rise to such Loss.

(R. 2 at 5-6.) In turn, the phrase "Owner Participant's Economics" is defined as

Owner Participant's nominal after-tax yield, total after-tax cash flow and total [Financial Accounting Standards Board] after-tax lease income for the first five years utilizing the multiple investment sinking fund method of analysis computed on the basis of the same methodology and assumptions as were utilized in the Owner Participant's original calculation of Basic Rent and Termination Value.

(R. 1 at 44.)[4]

Philip Morris contends that because the indemnity provision requires that Philip Morris's "economics" be preserved as if the income inclusion had not occurred, and because "economics" includes the concept of after-tax cash flow, the bankruptcy court erred by not taking into account that the circumstances giving rise to the income inclusion also gave rise to the loss of free cash that was factored into the structured transaction in order to pay the future taxes. In other words, Philip Morris's position is that the bankruptcy court erred in applying the "tax savings" credits

---

[4] The TIA provides that capitalized terms used but not defined therein (such as Owner Participant's Economics) shall have the meanings assigned to them in the Purchase Agreement, the Participation Agreement, and the Leases. (R. 2 at 1-2.) The Participation Agreement contains the definition of "Owner Participant's Economics."

because, given that Philip Morris expected future cash flows sufficient to cover the income taxes, Philip Morris enjoyed no net benefit from the elimination of the remaining future taxes.

The bankruptcy court rejected Philip Morris's argument, relying on Bankruptcy Judge Wedoff's reasoning in the case of In re UAL Corp., 346 B.R. 783 (Bankr. N.D. Ill. 2006), in which the court was presented with a similar leveraged lease transaction and tax indemnity agreement. In UAL, General Foods, an "Owner Participant," had lost the free cash it expected to receive from the transaction as a result of United Airlines's default and the indenture trustee's foreclosure on the aircraft involved. General Foods argued that in order to protect its "Net Economic Return," the court should account for General Foods's loss of free cash against the anticipated tax savings and thus make no reductions to the indemnity for the tax savings. Judge Wedoff disagreed and found that the concept of "Net Economic Return" could not be interpreted to increase the tax indemnity claim beyond the net change in tax consequences. 346 B.R. at 788. The district court affirmed Judge Wedoff's decision, stating that "General Foods' interpretation . . . transforms the TIA's purpose from indemnifying General Foods for the loss of certain tax benefits to indemnifying General Foods for the loss of Net Economic Return. This is inconsistent with the parties' manifest intent in the TIA." General Foods Credit Corp. v. United Air Lines, Inc. (In re UAL

Corp.), No. 06 C 4243, 2007 WL 256323, at *4 (N.D. Ill. Jan. 22, 2007).

We reject Philip Morris's argument, which is identical to that of General Foods in UAL, for the same reasons. Philip Morris's attempt to distinguish UAL is unavailing because it fails to explain why the minute factual differences between the cases are material. Moreover, Philip Morris does not present a commonsense interpretation of the TIA; it pulls the concept of "after-tax cash flow" wholly out of context, and its position that there is no net tax benefit because the taxes "never would have been a burden" due to the free cash is unpersuasive.[5] The TIA was intended to indemnify Philip Morris strictly for adverse tax consequences, not for all adverse consequences resulting from a premature termination of the transaction. Accordingly, we agree with the bankruptcy court that the TIA permitted "tax savings" deductions from Philip Morris's claims.

## C. The Calculation of the "Tax Savings" Deductions and Kmart's Expert Witness

Philip Morris's first objection to the manner in which the bankruptcy court calculated the tax savings offset is that the court "erroneously treated" the three categories of offsets that

---

[5] The argument is likewise rejected to the extent that it is relied on as a basis for the contention that the tax savings deduction for accrued interest was inappropriate.

Kmart sought "as calling for only a single determination." (Philip Morris's Opening Br. at 17.)

The bankruptcy court separately identified and explained each of the offsets that Kmart sought:

> Kmart identifies three types of tax savings. First, Kmart argues that the present value of the taxes that [Philip Morris] would have had to pay on the income related to the Indentures had the transaction run its course must be reduced from the tax indemnity amount. Second, the amount should be further reduced by the benefit [Philip Morris] gained from the accelerated deductibility of the transaction expenses, ordinarily amortized over the life of the transaction, caused by the premature ending of the transaction. Finally, the indemnity amount should be reduced by the amount of deductions relating to the accrued but unpaid interest on the Indentures.

362 B.R. at 389 (citations to the record omitted). The court then stated that it would "collectively refer to these three asserted reductions as the Tax Savings," and grouped the items together for further discussion. Id.

Philip Morris's position appears to be that the bankruptcy court was required to analyze each item separately and in detail to determine whether each item constituted "tax savings" and was therefore deductible from the indemnity. Philip Morris's companion argument is that the bankruptcy court erroneously relied on Kmart's expert witness, Isaac Sperka, who calculated the tax savings items. The objection is not that Sperka's testimony at the hearing was inadmissible, but that it was not entitled to "any weight" as to two of the three tax savings items because "Sperka gave the court

nothing but his bottom line"--"no supporting methodology or analysis." (Philip Morris's Combined Resp. and Reply Br. at 27-28.)

Mr. Sperka testified that he is a tax lawyer employed by Ernst & Young as a specialist in leveraged lease transactions. It is clear from our review of his testimony that, as the bankruptcy court found, he is well-versed in the tax consequences of leveraged lease transactions. It is also clear that, contrary to Philip Morris's assertion, Mr. Sperka supplied the bases for his calculations and thus more than merely a "bottom line." As the bankruptcy court explicitly found:

> Here, Sperka did not just give a naked opinion of what he thought was the amount of the Tax Savings. In arriving at his opinion, Sperka and his colleague consulted [Philip Morris's] ABC Pricing Files, which were admitted into evidence. The ABC Pricing Files contained information such as the depreciation applied to the properties, the interest rates on the Indentures, the amount of third-party debt involved, and the equity and fees invested by [Philip Morris]. Sperka also reviewed the tax returns and the damage model prepared by [Philip Morris], which are also in evidence. Finally, he testified concerning the inferential processes he used in reaching his conclusion. Therefore, and given his established and unquestioned expertise in this area, the court finds Sperka's opinion useful and of sufficient weight.

362 B.R. at 391 (citations to the record omitted). The bankruptcy court also noted that Philip Morris offered no alternative amounts for the Tax Savings, expressed no problems with the Tax Savings calculations, and withdrew its objection to the lack of support for Mr. Sperka's calculations. See id. Indeed, when cross-examined

about the calculation of the two items of Tax Savings at issue here, Philip Morris's own witness, its in-house tax counsel Richard Mahoney, endorsed Mr. Sperka's mathematical calculations. (R. 140 at 102 ("I wasn't able to verify it dollar for dollar, but it was close enough for me"); R. 140 at 124 ("I was able to check [Mr. Sperka's] math. . . . I agree with the math.").

Philip Morris's argument is essentially that Mr. Sperka was required to "show his work" mathematically. We disagree. Neither of the cases cited by Philip Morris supports the proposition that Mr. Sperka was required to describe every step of his calculations; they merely stand for the proposition that an expert must provide factual bases and reasons for an opinion. See <u>Kenosha Liquor Co.</u> <u>v. Heublein, Inc.</u>, 895 F.2d 418, 420 (7th Cir. 1990); <u>Mid-State</u> <u>Fertilizer Co. v. Exchange Nat'l Bank of Chicago</u>, 877 F.2d 1333, 1339 (7th Cir. 1989). Mr. Sperka explained the bases for his calculations and the documents and processes he used. Accordingly, it was entirely reasonable for the bankruptcy court to have relied on Mr. Sperka's calculations, especially given the absence of any contrary evidence and given that Philip Morris's own witness *agreed* with the computations.

We also reject the contention that the bankruptcy court was required to discuss each of the items of Tax Savings separately. Mr. Sperka testified at length about each item and why each constituted Tax Savings. He also testified on cross-examination

regarding why he would not apply a "present value" analysis to the deduction for unamortized fees, which Philip Morris now contends should have been applied.  The bankruptcy court found Mr. Sperka's opinions useful and persuasive.  Mr. Sperka's testimony was a clear basis on which the bankruptcy court could conclude that the three items all constituted Tax Savings.

## <u>CONCLUSION</u>

For the foregoing reasons, the bankruptcy court's Findings of Fact and Conclusions of Law and related orders of February 14, 2007 are affirmed.


DATE:      October 24, 2007



ENTER:     _____

John F. Grady, United States District Judge